## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOSEPH SIMMONS, | : | |
| | : | |
| | : | Civil Action No. |
| | : | 22-cv-01644 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| THE CITY OF PHILADELPHIA | : | |
| | : | |
| And | : | |
| | : | |
| WARDEN MICHELE FARRELL, | : | |
| | : | |
| And | : | |
| | : | |
| WARDEN NANCY GIANETTA, | : | |
| | : | |
| And | : | |
| | : | |
| PRISON COMMISSIONER BLANCHE | : | |
| CARNEY, in her individual | : | |
| capacity, | : | |
| | : | |

_____

Plaintiff's Complaint

1

And                                              :

                                                 :

JOHN DOE C.O. #1                                 :

John Doe, Sgt. #2                                :

John Doe, Lt.   #3

                          Defendants.            :

                                                 :

---

## PLAINTIFF'S AMENDED COMPLAINT

---

NOW COMES Joseph Simmons, complaining of Defendants Curran-Fromhold Correctional Facility, Philadelphia Department of Prisons, the City of Philadelphia, Warden Michele Farrell, Warden Nancy Gianetta, Prison Commissioner Blanche Carney, and John Doe C.O.s #1-3 and for cause would show the Honorable Court as follows:

### INTRODUCTION

1.  In July of 2018, The City of Philadelphia detained Joseph Simmons after his arrest and arraignment for assault charges. More than two years later, years later, still detained by the City of Philadelphia, deemed innocent and without any means to post bail, Simmons was assigned a new cell mate. Simmons' new cellmate, who claimed to be suffering from paranoid schizophrenia, was often physically and verbally abusive of Simmons. On February 22, 2021, when the abuse became too much to bear, Simmons reported to a correctional officer, Officer Wilson (Defendant John Doe, C.O. #1) that his cellmate had

---

threatened him with physical violence and that he, Simmons, was in imminent danger. Defendant John Doe C.O. #1 acknowledged Mr. Simmons pleas, but shockingly, left the area moments later, did not secure assistance for Mr. Simmons, and the area was left unattended throughout the night.  Moments after Defendant John Doe C.O. #1 left, Mr. Simmons' cell mate brutally beat and twice raped him.

2.  That such a horrific occurrence could continue for hours without intervention in the Philadelphia Department of Prisons is the shocking but predictable result of the City's consistent practice of massively understaffing its jails.   The block to which Mr. Simmons was assigned was intentionally left unattended by prison staff throughout the night.

3.  Despite knowing that PDP housing units require uninterrupted supervision by staff, that heightened supervision of individuals housed within higher custody units is necessary to ensure safety from harm to incarcerated persons, that backup personnel should be made reasonably available to ensure prompt attention to urgent matters that threaten the safety of people in PDP's care, and that the PDP was not providing it, PDP failed to protect Simmons from being assaulted.

4.  This is an action brought by the Simmons against the Defendants for their failure to protect him from known and obvious risks which resulted in this assault.  These claims are brought under the Fourteenth Amendment of the United States Constitution.

## PARTIES

5.  Plaintiff, Joseph Simmons, is an adult individual and a resident of the state of Pennsylvania currently incarcerated in SCI Rockview, 1 Rockview Pl, Bellefonte, PA 16823.

6.  Defendant, City of Philadelphia, a City of the First Class organized and existing under the laws of the Commonwealth of Pennsylvania was responsible for the creation and operation of the Philadelphia Department of Prisons including, but not limited to, the Curran-Fromhold Correctional Facility ("CFCF"). CFCF is located at 7901 State Road, Philadelphia, Pennsylvania.

7.  Defendant, Warden Michelle Farrell, was at all times relevant hereto, the Warden for the Curran-Fromhold Correctional Facility, responsible for the assignments, staffing, and operations of CFCF.

8.  Defendant, Deputy Warden Nancy Gianetta, was at all times relevant hereto, the Deputy Warden for Admissions and Diagnostics at the Curran-Fromhold Correctional Facility, responsible for ensuring inmate placement and safety.

9.  Defendant, Prison Commissioner Blanche Carney, was at all times relevant hereto, the Commissioner for the Philadelphia Department of Prisons of the City of Philadelphia. Defendant Carney was the final policymaker on correctional officer staffing levels within the Philadelphia Department of Prisons.

10. Defendant John Doe C.O. #1, is the corrections officer assigned to Mr. Simmons' unit who abandoned the unit on the night Mr. Simmons was assaulted without ensuring a replacement officer was present.

11. Defendant John Doe Sgt. #2 is the corrections sergeant who failed to address or investigate Simmons reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention.

_____

12.     Defendant John Doe Lt. #3 is the corrections lieutenant who failed to address or investigate Simmons reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention.

## JURISDICTION AND VENUE

13.  Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. § 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourteenth Amendment rights of the Simmons.

14.  Venue is proper in this Honorable Court as Defendants' constitutional violations and otherwise violative conduct occurred within the Eastern District of Pennsylvania.

## FACTS

**The Detention of Joseph Simmons.**

15.  In July of 2018, Joseph Simmons was detained to await trial for assault charges.

16.  Bail was set, but Simmons was unable to post.

17.  Because Simmons was unable to post bail, his detention awaiting trial, extended into 2021.

18.  Simmons was originally held in the Philadelphia Industrial Correctional Center, or PICC.

19.  In October of 2019, the Philadelphia Department of Prisons or PDP, transferred Simmons to Curran-Fromhold Correctional Facility, or CFCF.

20.  In October of 2020, the PDC disciplined Simmons for the alleged use of abusive language and placed him in disciplinary segregation, on the housing unit A1P4 at CFCF.

_____

**The Initial Assaults of Joseph Simmons.**

21. While in segregation, Mr. Simmons was assigned a new cell mate ("Cell Mate")[1].

22. Cell Mate is approximately six-foot, one inch tall and weighs approximately two hundred and forty pounds.

23. Cell Mate, outweighed Simmons by approximately sixty pounds.

24. Cell Mate had a reputation among prisoners and correctional officers for unpredictable swings in mood and violent tendencies.

25. Cell Mate told Mr. Simmons that he suffered from paranoid schizophrenia.

26. Simmons and Cell Mate shared one cell in disciplinary segregation until November or December of 2020, when they were transferred to a different cell for purposes of administrative segregation.

27. From October 2020 until November or December of 2020, Cell Mate physically assaulted Simmons on several occasions.

28. Simmons did not immediately report the assaults to a correctional officer because he feared doing so would result in further abuse and assaults from Cell Mate.

29. Despite those fears, near the conclusion of his segregation in December of 2020, but before his assignment to a new cell, Simmons reported to a correctional officer that he did not want to remain in a cell with Cell Mate as he believed he would be assaulted again and feared for his safety.

---

[1] The Cell Mate's full legal name is unknown to Mr. Simmons. Because (1) the legal name of Cell Mate has not been verified, and (2) the Philadelphia Department of Prisons has access to cell roster information that would allow Mr. Simmons to determine the real name of his assailant, Mr. Simmons utilizes Cell Mate to refer to his assailant in this filing.

**Joseph Simmons Reports that His Life is in Danger.**

30.  Despite Simmons' report to the correctional officer that he feared for his safety if he remained in a cell with Cell Mate, he was again assigned to share a cell with him on A-1 pod 4.

31.  The relationship between Simmons and Cell Mate continued to deteriorate.

32.  Sometime on or around February 19, 2021, Cell Mate started accusing Simmons of reading his mail, touching his belongings, and plotting to harm him.

33.  Simmons was not reading Cell Mate's mail, touching Cell Mate's belongings or plotting to harm him; Simmons' only intention was to placate Cell Mate and avoid any additional assaults.

34.  For several days after or around February 19, 2021, Cell Mate threatened to physically assault Simmons with increasing intensity and regularity.

35.  Simmons told Cell Mate that he didn't want to fight with him and that he was trying to get moved out of the cell.  Simmons sought only to avoid any physical altercations with him.

36.  For several days after or around February 19, 2021, Simmons pled with correctional officers to move him from the cell because Simmons was afraid he was going to be assaulted by Cell Mate.

37.  Finally on February 22, 2021, after Cell Mate's behavior became so erratic and his threats of violence to severe, Simmons pressed the emergency call button in his cell to plead for help at approximately 10 pm. Mr. Simmons screamed from his cell and told the officer

_____

John Doe CO 1 Correctional Officer Wilson that he feared for his life and felt in danger of an imminent physical assault.

38. Upon information and belief, John Doe CO 1 Wilson was the only staff member on duty in the segregation unit at the time, a unit that requires closer supervision and additional staffing to ensure the safety of incarcerated persons.

39. After receiving Simmons report, John Doe CO # 1 did not intervene. Instead, he yelled at Mr. Simmons from his desk area and said that he would put his concerns in the logbook and tell his sergeant and lieutenant about Simmons' fears.

40. John Doe C.O. #1 did not attempt to deescalate the situation and did not provide any immediate assistance beyond documenting Simmon's complaint. Inexplicably, John Doe C.O. #1  then left the pod without being relieved for duty by another correctional officer and without hearing back from his sergeant or lieutenant.

**Joseph Simmons is Beaten and Raped.**

41. As soon as John Doe C.O. #1  left the block, thereby leaving all individuals housed on A1P4 unsupervised, Cell Mate put a towel over the cell window, a violation of CFCF rules.

42. If a correctional officer remained on the block, or if a correctional officer appeared to relieve John Doe CO # 1, Cell Mate and Simmons would have been directed to remove the towel.

43. The towel over the cell Simmons and Cell Mate's window remained until the next morning when a correctional officer reported to the block for the first time since the night since John Doe C.O. # 1 departed without being relieved.

44. After placing the towel over the window, Cell Mate approached Simmons who was sitting on his bunk.

45. Simmons pleaded with him and told him he did not want to fight.

46. Cell Mate continued to approach Simmons.

47. Simmons stood up and raised his hands defensively.

48. Cell Mate began punching and hitting Simmons in the face and body.

49. Cell Mate pushed Simmons up against the wall and continued to punch Simmons in the face and body.

50. Simmons cried for help and one of the other prisoners called back that there was not a correctional officer on the block.

51. Simmons continued to defend himself from Cell Mate's attacks, but after a prolonged struggle, Cell Mate leaned forward and bit Simmons in the face. When Simmons reached up to his face, Cell Mate grabbed Simmons penis and testicles and began squeezing.

52. Simmons begged Cell Mate to let go of his testicles and tried to hold as still as possible.

53. Eventually, he released Simmons. Shocked and in severe pain Simmons staggered to the toilet to examine himself. As he approached the toilet, Cell Mate came up behind him and again grabbed and squeezed his penis and testicles.

54. With Simmons' penis and testicles in his hand, Cell Mate slammed Simmons head down towards the toilet and ripped down his pants. He then penetrated Simmons anally with his penis.

55. Simmons begged him to stop but was powerless to end the attack because Cell Mate was squeezing his penis and testicles so hard he was unable to resist.

_____

56. When Cell Mate finished assaulting Simmons, Simmons dragged himself to his bunk and Cell Mate laid down in his bunk.

57. An indeterminate time later, Cell Mate got up out of bed, pulled Simmons half-way out of bed and anally penetrated Simmons with his penis again while restraining Simmons with his arms and bodyweight.

58. When Cell Mate finished raping Simmons again, Simmons again pulled himself into bed while Jabri laid down in his bunk.

59. The next morning, when a correctional officer finally reported to the block, they were ordered to remove the towel from the window.

60. Simmons was too fearful for his safety to immediately report the assault and rape. Nonetheless as a result of the brutal beating and rape, he had chipped a tooth, a human bite mark on his face, a sprained wrist, and swollen penis and testicles.

61. That day, and as soon he was no longer in the cell with Cell Mate and had an opportunity to report the attack, he told a correctional officer that he had been assaulted by Cell Mate and could not be put back in a cell with him. That day, he also told a correctional officer that he needed immediate medical attention.

62. Despite the chipped tooth and obvious bite mark on his face, the correctional officer failed to send him to get medical attention.

63. For many days after the assault, there was blood in Simmons urine.

64. After several days of requesting medical attention and not receiving it, Simmons confided in his mother that he needed immediate medical attention.

65. Simmons mother then called the prison and demanded her son get medical treatment.

_____

66. Simmons went to the medical unit at the prison, and then sent to Jefferson Torresdale Hospital for a MRI of his testicles.

67. Despite the nature of Mr. Simmons injuries, neither correctional officers nor prison nurses to Mr. Simmons's knowledge initiated a PREA report, violating PREA standard §115.61 (a), which requires "all staff to report immediately and according to agency policy any knowledge, **suspicion**, or information regarding an incident of sexual abuse or harassment that occurred in a facility."[2]

68. After the assault and rape Simmons filed a grievance pursuant to the PDP policies and procedures.

69. After receiving no response to his grievance, Simmons appealed to Commissioner Carney asking if his grievance had been received.

70. Commissioner Carney replied to Simmons' letter that she had no record of the complaint but that the Prison administration would look into his allegations.

71. Simmons exhausted his administrative remedies.

## FAILURES OF THE PHILADELPHIA DEPARTMENT OF PRISONS

72. For years, the Philadelphia Department of Prisons has displayed a consistent and systemic failure to maintain proper staffing practices, resulting in a significant understaffing leading to an increase in inmate deaths directly related to the lack of supervision.

---

[2] PREA Standards, § 115.61 (a) https://www.prearesourcecenter.org/standard/115-61

73. Prison Commissioner Blanche Carney and Wardens Michele Farrell and Nancy Gianetta have long been aware of the dangers created by their failure to maintain proper staffing.

74. Not only did the City of Philadelphia tolerate the escalating danger from their lack of staffing, Commissioner Carney went so far as to blame the issue on the general staffing shortages caused by the COVID-19, despite there being evidence that this practice existed long before the pandemic.

**PDP's Established Practice of Understaffing**

75. Understaffing has been a long-followed practice of the City of Philadelphia.

76. On November 4, 2004, then-Commissioner Leon King implemented a limited overtime policy for PDP officers, sparking significant under-staffing.

77. This understaffing led to an increase of violence in the jails and a deprivation of inmates rights, as well as federal litigation to resolve the issue.

78. In 2018, following the closure of the House of Corrections and the population reductions at the Alternative & Special Detention housing area, PDP revised its staffing post-plan. Previously, the Department authorized 2,032 security posts. Following the reorganization at PDP, the new plan authorized 1,820 posts. Even still, PDP's staffing post-plan still reflected an overall shortage of 129 security officers.[3]

79. In 2019, authors of an independent report authorized by City Council wrote that PDP's "level of overtime use, in conjunction with its high ratio of inmates to correctional

---

[3] "Cost Efficiency Analysis: Philadelphia Department of Prisons Final Report," *CGL* (Feb. 28, 2019) at 14. https://phlcouncil.com/wp-content/uploads/2019/04/Philadelphia-Cost-Efficiency-Analysis-Final.03.25.19.pdf

officers, indicates that the PDP is likely understaffed relative to other systems under review."[4]

80. In her testimony before the Philadelphia City Council in May of 2019, Commissioner Blanche Carney also noted in her testimony that "we've been understaffed for a number of years."[5]

81. Despite these assessments, according to the Philadelphia Office of the Controller, from 2019 to April of 2021 the PDP saw staff vacancies triple and conditions within the facilities become increasingly unsafe.[6]

82. Between August 2020 and May 2021 there were at least five homicides at PDP, a total higher than the previous eight years combined.[7]

83. City Controller Rebecca Rhynhart expressed grave concern with staffing, stating:

"The Department of Prisons is at a tipping point. Inadequate staffing levels have led to unsafe conditions for workers and confinement of inmates, many of whom are pre-trial, to their cells – sometimes for 20 or more hours a day… The City is responsible for the Department of Prisons' more than 1,500 correctional officers and approximately 4,600 inmates. We have a duty to provide safe working conditions

---

[4] *Id.* at 10. The other systems under review included Dade County, FL, Cook County, IL, Sacramento County, Riverside County, CA, and Santa Clara County, CA, all similar in population size to the Philadelphia jail system.
[5] "FY 2020 Budget Hearing Philadelphia Prisons 5-1-2019" *Philadelphia City Council*, (May 1, 2019) https://www.youtube.com/watch?v=60SvdsQ923Y&ab_channel=PhiladelphiaCityCouncil
[6] "Controller Rhynhart Calls for Staffing Increase at the Philadelphia Prisons Department to Improve Safety for Correctional Officers and Inmates" *City of Phila Office of the Controller*, (June 30, 2021) https://controller.phila.gov/controller-rhynhart-calls-for-staffing-increase-at-philadelphia-prisons-department-to-improve-safety-for-correctional-officers-and-inmates/
[7] "Expert Report by Bradford Hansen on Philadelphia Jails," *Thomas Remick et. al. v. City of Philadelphia and Blanche Carney*, (March 21, 2022) https://www.documentcloud.org/documents/21636473-expert-report-by-brandon-hansen-on-philadelphia-jails

and humane living conditions. The City must take an all-hands-on-deck approach

to reach this hiring goal, with rigorous recruitment and multiple classes."

84. This assessment was based data provided by PDP which showed that from 2019 – 2021,

correctional staffing declined by 440 officers and only 119 new officers were hired within

that same period. At the time of the statement, Rhynhart indicated that more than 300

COs were needed to meet adequate staffing.[1]

85. The City of Philadelphia acknowledged the danger that the staffing shortages create,

pointing to the five inmate on inmate homicides in PDP facilities from August 2020 – May

2021. A total that exceeded the prior eight years combined.[1]

86. The *Philadelphia Inquirer*, frequently reported on the failures of the PDP, including an April

23, 2021 article that stated that there were shifts where as many as 14 of the 15 workers

abandoned their shifts.[8]

87. On May 19, 2021 it was reported that 64% of staff called out on Mother's Day weekend.[9]

88. Commissioner Carney acknowledged that PDP was short 333 staff positions.[3]

89. This number continued to grow, and in June 2021 it was then reported that PDP was

short 382 officers needed to operate safely.[10] By August 26, 2021 the gap had grown to 483

officers.

90. In an August 26, 2021 report, the Pennsylvania Prison Society executive Director Claire

Shubik-Richards stated "we have been warning the city for months that the prison is

dangerous, unconstitutional in its conditions, and past the boiling point."[4]

---

[8] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[9] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html
[10] https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html

Plaintiff's Complaint

91. Correctional officers, including lieutenants, captains, and veterans of more than 20 years, told the *Inquirer* in October 2021 that the conditions in PDP facilities are the "worst they have ever seen."[11]

92. It was then reported that the number of staff needed to operate safely had grown to 500.

93. Highlighting the danger the danger in the Philadelphia Prisons is the fact that the PDP inmate population fell by 2% since 2019, yet over that same period seen staffing levels dropped by 28%.

94. On November 4, 2021, an analysis of PDP staffing rosters found that 20-30% of shifts on a given day were filled by officers and supervisors working overtime, and more than 40% of shifts listed were not filled at all.[12]

95. David Robinson, the president of the correctional officers' union, Local 159 of AFSCME District Council 33, stated that "we're in a situation where we don't have staff. That makes the prisons dangerous...they had an obligation to keep these jails safe. And I'm going to be honest: I believe they failed."[13]

96. By the November report, the City Controllers officer claimed a 28% vacancy rate within PDP.

---

[11] https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage20211006.html#loaded

[12] https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

[13] Samantha Melamed and Dylan Purcell, "Stabbings at Philly jails went unnoticed amid staff shortages, video shows," *The Philadelphia Inquirer*, (Nov. 4, 2021) https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

Plaintiff's Complaint

97. Commissioner Carney suggested then and has since continued to suggest that the COVID-19 pandemic is to blame, however at the same time the Pennsylvania Department of Corrections reported only a 5.6% vacancy rate.[14]

<u>Remick v. City of Philadelphia</u>

98.    In April of 2020, ten incarcerated individuals within various facilities operated by the Philadelphia Department of Prisons filed a civil rights class action lawsuit against the City of Philadelphia and Prison Commissioner Blanche Carney over the conditions of the prisons and treatment of inmates by staff.

99. Understaffing within the Department of Prisons was identified in that litigation as a central cause of most of the constitutional violations claimed.

100. Judge Schiller ordered the City and Carney (hereafter "Defendants") through a partial settlement agreement dated June 3, 2020 to rectify certain failures including providing regular staff to maintain safe and optimal operations for inmates.

101. A corrections expert employed by Plaintiffs in the case wrote the following in his report on the conditions at PDP: "The PDP is in a state of crisis as evidenced by the information above. This crisis is creating an unsafe and violent environment for inmates to live in. It must be stated emphatically that while there is a shortage of staff the Philadelphia Prison system still has the duty to protect inmates that are assigned to their facilities."[15]

---

[14] *Id.*
[15] Expert Report, Remick v. City of Philadelphia and Blanche Carney at 9.

102. In 2022, Judge Schiller ordered the appointment of an independent monitor to oversee the implementation of the settlement agreement to address Plaintiffs' complained of constitutional violations.

103. In a report docketed on November 4, 2022 (ECF 181), the Monitor stated that "PDP's increases in sworn staff resignations from FY 19/20 and 20/21 by 55% and 107% respectively for an overall 221% increase over the two-year period reflect debilitating personnel losses." The Monitor stated further: "Because Defendants have a duty to meet basic human needs and protect the constitutional rights of those confined it its facilities, correcting PDP's personnel crisis should be prioritized among the most critical City initiatives..."[16]

### Reports

104. Throughout the entirety of the case there were frequent status reports regarding Defendant's compliance.

105. A report dated September 24, 2020 concluded "according to an initial review of the staffing reports produced by Defendants, CFCF appears to have the greatest issue with staffing shortages, with many months reporting a shortage of over 100 staff. Of the five facilities, the housing units at CFCF report the most pervasive incidents of noncompliance with the Order." (9/24/2020 Report at pp. 3, 7-10).

---

[16] "Monitor's First Report," *Remick v. City of Phila and Blanche Carney*, at 8-9 (ECF 181).

Plaintiff's Complaint

106. The report noted that due to staffing shortages there would be times when "no CO enters a unit for upwards of two hours at a time, leading to delayed response to fights or medical emergencies." (*Id.* at p. 3; fn 2).

107. Within that same filing, Defendants acknowledged that "staff non-attendance has been an issue." (*Id.* at pp. 7, 11).

108. On October 7, 2020, both parties convened for a joint status report where it was noted that the City and Commissioner admitted their failure to comply with he Court Order, citing staff shortages. (10/7/2020 Report at p. 2).

109. Defendants acknowledged that at CFCF in particular, units would often face severe staff shortages for several days in a row which led to further the continued failure to comply with the order. (3/4/2021 Report at pp. 2, 7-8).

110. A March 19, 2021 joint status report again pointed out insufficient staffing as the primary reason reported by both inmates and PDP administrators for the City's failures to provide for inmate needs. (3/19/21 Report at p. 1).

111. Defendants cited "strenuous staff shortages" as the reason for their failure to allow inmates adequate out-of-cell time as required by the order. (*Id.* at pp. 2, 7-8).

112. This status report also made clear that despite the City of Philadelphia, PDP, and Commissioner Carney all blaming general staff shortages on the COVID-19 pandemic that "these issues are limited to the security staff," and that other areas, such as medical staff, are not calling out or failing to show to their shifts in the way that COs are. (*Id.* at pp. 3-4).

_____

113. Within the April 8, 2021 report, it was made clear that the City, Commissioner Carney and the Wardens alike were aware that insufficient staffing would reasonably result in dangerous conditions, and that the failures had grown so severe that "there is no realistic prospect for the hiring of addition[al] correctional officers that will remedy these issues in the near-term. The price for this failure is being borne by incarcerated persons." (4/8/2021 Report at pp. 3, 17-18).

114. Staffing issues continued to become more severe, being labelled a "staffing crisis" by PDP in the August 19, 2021 status report.

115. Soon after, a September 9, 2021 status report again outlined the staffing crisis.

116. It was found then through data provided to the Court that the PDP staffing crisis was "caused not only by high rates of staff absenteeism, but also by the City's failure to have sufficient numbers of corrections officers to properly staff PDP facilities," with no "realistic plan for closing the gap in terms of correctional staffing." (9/9/2021 Report at p. 2).

117. The PDP and the City continued to fall short of addressing their long-standing inadequate staffing, despite the repeated notices and prolonged dangers. (*Id.* at p. 2).

**Statements from Incarcerated Persons**

118. Between September 2020 and September 2021 incarcerated persons at PDP-run facilities provided declarations on their experiences within the prisons as part of the *Remick* litigation.

_____

119. Across the board, they reported significant lack of staff resulting in the deprivation of their out-of-cell time, medication, mail, and proper supervision.

120. On September 20, 2020, Jacquar J. Stokes, an person housed at CFCF, said in his declaration that he had experienced the negative impacts of CFCF's understaffing.

121. Mr. Stokes stated that "insufficient staffing is a big impediment to our wellbeing. We are kept in our cells for days at a time and told this is because there are not enough COs on duty," noting that on the weekends "none" of the regular CO's report to their shifts.

122. Another person at CFCF, Daniel Marshall, stated that on August 19, 21, 22, 24, and 26, 2020, they were not let out of their cells at all, with the only explanation on August 21st being that "not enough guards were present at the facility."

123. Kenneth Clark, an incarcerated person at CFCF, stated that on top of inadequate staffing generally, even the correctional officers that do come to their shifts sometimes would "leave for lunch and do not come back to let us out of our cells."

124. Also on December 3, CFCF incarcerated person Naeem Beyah stated that even though he is a block worker, he and other block workers are not permitted to leave their cells at times due to a lack of staff on the unit.

125. At the Philadelphia Industrial Correctional Center, another facility operated by PDP and Commissioner Blanche, Tony Bizzell stated that there were also inadequate staff there resulting in dangerous and neglectful conditions, including on December 28, 2020 when Bizzell stated that another person committed suicide. Bizzell states that "I heard him asking for help several times before he died, but staff did not attend to him."

126.   Karren Sprual, another person housed at CFCF, claimed in his declaration that "staff tells us that there are not enough correctional officers to have rovers on each unit." Rovers are staff members that move between units as additional assistance and support.

127.   CFCF incarcerated person John Hart further corroborated the lack of CO's, stating that "it has become commonplace to go large stretches of time without seeing COs on our unit."

*Inmate Emergencies and Violence Ignored*

<u>Dale Curbeam</u>

95.   On January 15, 2021, 60-year-old Dale Curbeam was found face down in his cell at CFCF.

96.   Curbeam was pronounced dead just a few minutes after being discovered. The cause of death was ruled a homicide by blunt impact head trauma. Curbeam's cellmate was arrested in connection with the murder.

97.   According to a report by the *Inquirer*, only one staffer was assigned when Curbeam was murdered.[17]

<u>Christopher Hinkle</u>

98.   Christopher Hinkle was arrested for a minor drug charge but was unable to pay his bond. He was sent to CFCF, where he was housed on the same cellblock as Mr. Faison.[18]

99.   On April 12th, Mr. Hinkle was beaten by his cellmate in a brutal, prolonged attack.

---

[17]https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html
[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

Plaintiff's Complaint
21

100.  Hinkle sustained a broken neck among other blunt injuries.[19]

101.  Hours passed before Hinkle was discovered.

102.  The delay in discovering Hinkle rendered him unsavable. Once found, he was put on life support before he died.[20]

103.  Hinkle's cellmate reportedly admitted to the assault. The cellmate had a long record of random assaults and violent criminal offenses, most of which appeared unprovoked.[21]

104.   Hinkle was a non-violent offender.

<u>Rashaan Chambers</u>

105.  In April of 2021, Rashaan Chambers was an inmate at CFCF.[22]

106.  On April 6, Chambers attempted to get medical care for his diabetes but was reportedly denied.[13]

107.  According to his mother, Chambers reported that no guards checked on him during the night nor did they complete morning checks.

108.  Feeling ill, Chambers did not go out of his cell for recreation time on April 7, but this did not alert staff to check on him. Staff reportedly did not seek care or check on Chambers until his family complained.

109.  Chambers was eventually taken to the hospital.

---

[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html
[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html
[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html
[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

110.  On April 16 at 8:42 a.m., Chambers was pronounced dead from complication of diabetic ketoacidosis.

111.  Despite there being a clear need for assistance, Chambers was ignored until his condition was too severe to survive.

Eli Rosa

112.  In a 2021 letter, Eli Rosa described the lack of correctional officers at CFCF where he was an inmate.

113.  Rosa wrote: "I've done had seizures, fights and fell off my bunk, and no C/O was around to help me get medical attention."[23]

Quincy Day-Harris

114.  On August 25, 2021 at the Detention Center, operated by PDP, 25 year old inmate Quincy Day-Harris died by suicide.[24]

115.  According to his family, Day-Harris suffered from paranoid schizophrenia which was well documented through previous times when the jail had admitted him to the hospital for psychiatric purposes.

116.  Day-Harris's family feels that the jail did not provide adequate oversight despite knowing that Day-Harris had documented mental health needs, resulting in his death.

---

[23] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html
[23] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

Unknown Inmate #1

117.    Norman Cooper, an inmate in CFCF's custody, reported that in 2020 an unknown inmate on his cell block committed suicide.[25]

118.    It is alleged that due to insufficient staffing leading to guards not checking on cells, the unknown inmate was left hanging for several hours.

119.    According to Cooper, the cellmate of the unknown inmate was banging on their cell for hours trying to summon help. The calls went unanswered.

Unknown Inmate #2

120.    On September 30, 2021, an unknown inmate at CFCF was repeatedly beaten and stabbed by three other inmates.[26]

121.    There were no guards on the cell block.

122.    The unknown inmate, with no help available, staggered back to his cell as other inmates mopped up the blood.

Armani Faison

123.    On March 2021 Armani Faison was arrested for shop lifting and detained at CFCF to await trial.

124. On March 27, 2021 while in custody at CFCF, his cell mate, Kevin Massey repeatedly raped Armani Faison.

---

[25] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

125. Despite repeated calls for help by Faison and other prisoners on the block, the rape only subsided upon the death of Faison.

126. The next morning, Faison's body was found naked, bloodies and floating in six inches of water.

127. For the entire duration of the assault and rape, there was no correctional supervision on the block.

<u>COUNT I: FOURTEENTH AMENDMENT</u>
AGAINST ALL INDIVIDUAL DEFENDANTS

128. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

129. As set herein, this is a civil rights action brough pursuant to 42 U.S.C. § 1983 that challenged the unconstitutional actions of the Defendants that resulted in the rape and assault of Simmons.

130. At all relevant times hereto, Defendants were "persons" acting under color of state law.

131. The Fourteenth Amendment imposes on Defendants the obligation to take reasonable measures to protect pretrial detainees from violence at the hands of other inmates.

132. As explained above, Defendants failed in their obligation at every turn.

133. Defendants' conduct exposed Joseph Simmons to a substantial risk of harm.

134. Defendants knew of and were deliberately indifferent to those known risks.

135. As a result of Defendants deliberate indifference, Joseph Simmons was raped and assaulted.

136. Defendants were in direct violation of the Fourteenth Amendment, as well as their own policies, when they recklessly, willfully and with deliberate indifference failed to remove Joseph Simmons from his cell after being alerted to the significant risk of injury posed by leaving him unsupervised in his cell.

_____

137. While acting under color of state law, Defendants affirmatively created the danger that led to Simmons injuries by:

a. Failing to maintain appropriate staff in the inmate housing units;

b. Leaving Joseph Simmons in his cell after being specifically told of the danger of bodily harm he faced if he remained in his cell;

c. Failing to have a corrections officer on Mr. Simmons's cell block;

d. Failing to conduct regular checks of the cells housing inmates for several hours;

e. Failing to respond to repeated asks for help by Simmons and neighboring inmates;

f. Failing to adequately protect Simmons from injuries while in their custody and control; and,

g. Willfully subjecting Simmons to repeated rapes and assaults described herein.

138. The danger created by the Defendants as set forth above was foreseeable and direct, and through their failures, willful disregard, and deliberate indifference to Mr. Simmons' safety, Defendants acted with a degree of culpability that shocks the conscience.

139. Defendants acts and omissions caused Simmons to suffer extreme and severe physical and emotional distress, terror, and agony.

   **WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendants Carney, Gianetta, Farrell, and John Does #1-3 pursuant to 42 U.S.C. § 1983, in an amount in excess of Five Million Dollars, including interest, delay damages, costs of suit, general and specific damages, punitive damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.

_____

Plaintiff's Complaint

## COUNT II: FOURTEENTH AMENDMENT MUNICIPAL LIABILITY

### AGAINST DEFENDANT THE CITY OF PHILADELPHIA

142. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

143. The customs, practices, and policies of the City of Philadelphia were a moving force behind the violation of Simmons' constitutional rights.

144. Simmons was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, and by the City of Philadelphia through its many failures addressed *supra*.

145. Policymakers and authoritative figures knew of the failures of the Philadelphia Department of Prisons as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the inmates in their custody and control.

146. The official and/or unofficial policies, practices, or customs of failing to train jail employees to respond to emergencies, inadequately staffing the jail, and delaying assistance for emergency situations resulted in the deprivation of Mr. Simmons's constitutional rights.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant the City of Philadelphia, pursuant to 42 U.S.C. § 1983, in an amount in excess of Five Million Dollars, including interest, delay damages, costs of suit, general and specific damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.

### COUNT III: FOURTEENTH AMENDMENT
### AGAINST ALL INDIVIDUAL DEFENDANTS

147. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

_____

148. As set herein, this is a civil rights action brough pursuant to 42 U.S.C. § 1983 that challenged the unconstitutional actions of the Defendants withholding necessary medical treatment.

149. At all relevant times hereto, Defendants were "persons" acting under color of state law.

150. The Fourteenth Amendment imposes on Defendants the obligation to take reasonable measures to protect pretrial detainees from violence at the hands of other inmates.

151. As explained above, Defendants failed in their obligation at every turn.

152. Defendants' conduct exposed Joseph Simmons to needles pain.

153. Defendants knew of and were deliberately indifferent to those known risks.

154. As a result of Defendants deliberate indifference, Joseph Simmons received no medical attention to resolve his broken tooth, bitten face, or swollen testicles and penis.

155. Defendants were in direct violation of the Fourteenth Amendment, as well as their own policies, when they recklessly, willfully and with deliberate indifference denied Simmons reasonable request for medical care aware that such denial exposed Simmons to substantial risk of pain.

156. The danger created by the Defendants as set forth above was foreseeable and direct, and through their failures, willful disregard, and deliberate indifference to Mr. Simmons' safety, Defendants acted with a degree of culpability that shocks the conscience.

157. Defendants acts and omissions caused Simmons to suffer extreme and severe physical and emotional distress, terror, and agony.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendants Carney, Gianetta, Farrell, and John Does #1-3 pursuant to 42 U.S.C. § 1983, in an amount in excess of Five Million Dollars, including interest, delay damages, costs of suit, general and specific damages,

punitive damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally

appropriate at the time of a jury trial.

Respectfully submitted,

MCELDREW PURTELL                      ABOLITIONIST LAW CENTER

/s/ Colin S. Haviland                   /s/ Nia O. Holston
Colin S. Haviland, Esq.               Nia O. Holston, Esq.
John J. Coyle, Esq.                       Bret D. Grote, Esq.
Daniel N. Purtell, Esq.               PO Box 8654
Mark V. Maguire, Esq.              Pittsburgh, PA 15221
123 South Broad Street             t: (267) 357-0948
  Suite 2250                         nia@alcenter.org
  Philadelphia, PA 19109          bretgrote@abolitionistlawcenter.org
t: (215) 545-8800
chaviland@mceldrewpurtell.com
jcoyle@ mceldrewpurtell.com
dan@ mceldrewpurtell.com
mmaguire@ mceldrewpurtell.com