# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : | No.: 2:20-cv-01959-BMS |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## MONITOR'S SECOND REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Second Report evaluating Defendants' compliance with the terms of the Agreement through December 31, 2022. The Monitor prepared this report as the second of regular reports to be filed of record. The Monitor also hereby confirms that by authorization of this Court, and in consultation with the *Remick* parties, regular reports will now be filed semiannually, according to the following schedule:

| | |
|---|---|
| Monitor's Third Report | September 15, 2023 |
| Monitor's Final Report | March 29, 2024 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: March 3, 2023

Respectfully submitted,

By: /s/ Cathleen Beltz____
    Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date. In this reporting period, the Monitoring Team utilized data and information tracked through December 31, 2022.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and Class Members. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement. In addition to at least one quarterly site visit, the Monitor will conduct periodic site visits with little advance notice to PDP.

The *Remick* Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[1] The Monitor has retained a

---

[1] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022)

deputy monitor who, in consultation with the Parties, has established a mechanism to receive information pursuant to this requirement. Deputy Monitor Ryan Grosso is an advocate committed to public policy and carceral reform. He has more than six years of experience as a practicing attorney in Philadelphia, including five years of criminal defense work with the Defender Association of Philadelphia where he represented many incarcerated clients.

The Deputy Monitor conducts monthly site visits to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor schedules weekly confidential tablet meetings with Class Members who desire more privacy than can be achieved during housing unit discussions alone.[2] PDP has posted the Agreement on all housing units along with a memorandum to Class Members describing the Monitoring Team's role and inviting communication with the team.

The Monitoring Team also receives memoranda from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Deputy Monitor with Class Members' identifying information, and the Deputy Monitor, or others on the Monitoring Team, follow-up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Thus far, the information received via this protocol confirms both improvements and deficiencies detailed in *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

Information that the Monitor obtains via reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, and others independent of PDP provides valuable historical and factual context for PDP's current conditions. It augments the Monitoring Team's direct observations and shapes recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their contributions and commitment.

In assessing PDP's implementation of the Agreement, the Monitoring Team attempts to identify any Class Member grievances related to each substantive provision. Grievances are a rich supplement to information the Monitoring Team receives through site visits, data, documentation, and interviews. They add nuance to compliance analysis, inform determinations, and are critical in the identification of emerging systemic deficiencies. PDP's grievance system is not useful for compliance monitoring. An alarming lack of grievances about well-established deficiencies outlined in the Agreement that greatly impact Class Members' basic human needs suggests PDP's grievance system is overwhelmed and ineffective.

Class Members regularly report to the Monitoring Team during site visits that grievance forms are unavailable on housing units, not provided in triplicate form so that Class Members have records of their filings, and that their submitted grievances are ignored. On one housing unit in this reporting period, a Class Member indicated that he could not submit a grievance because the

---

[2] Monthly site visits commenced in October 2022, and weekly two-hour tablet meetings commenced December 6, 2022.

housing unit grievance box was full.  Indeed, the Monitoring Team observed the grievance receptacle so compacted with completed grievance forms that it could not accommodate more.

PDP personnel report that they attempt to ensure that grievance forms are retrieved at regular intervals, properly logged, prioritized, investigated, and responded to.  Living unit staff and facility managers communicate a clear understanding of their responsibilities, that grievances protect the legal rights of Class Members, and that they are one of few means by which Class Members can document their needs and seek to have them met.  Unit personnel do not appear indifferent to the ineffective grievance system, but they are clearly challenged in fixing it.  One option currently being considered is the filing of grievances via tablet in addition to paper forms, which should aid in grievance tracking and accountability.

Under intense scrutiny, PDP executives are attempting comprehensive systemic reform with greater challenges and fewer tools than ever before.  For reasons previously reported, achieving compliance with the Agreement will likely require years.  The Monitoring Team has therefore recommended that PDP establish implementation priorities with an eye toward changes that are most likely to improve the daily lives of those confined and working in its facilities.  Though the grievance system itself is not subject to Agreement monitoring, it is certainly part of normal jail operations addressed in Substantive Provision 4, and PDP executives understand that repairing it is one such priority.

Another significant challenge for PDP and the Monitoring Team is the fidelity of PDP's data.  PDP does not currently have adequate tracking systems for individual access to several services such as law library, visiting, and out-of-cell time.  Far too many reports are generated by manual data entry, which leads to inaccuracies.  Additionally, the Jail Management System (JMS) database is not integrated with health care data systems, which requires cross-referencing of manually generated lists for important basic information.  For example, PDP must compare separate healthcare and security lists to identify which Class Members in segregation are also seriously mentally ill (SMI), but because data points used to compile the lists are different, they are not wholly compatible and comparisons are not always accurate.

Reports based on methodologically flawed data collection are necessarily flawed, and neither PDP executives nor the Monitoring Team can validate them with certainty.  In making compliance determinations, the Monitoring Team is unable to rely on single reports and must typically compare several types of data and reports to generate the tables and other information reported to the Court.  Nevertheless, data is critically important for systems this size to measure trends and identify necessary improvements.  Internal monitoring of systemic issues is key to sustaining reform successes and data analysis will become PDP's most effective tool once systems are improved.  If properly analyzed, cross-referenced, contextualized, and supplemented with qualitative information, PDP's data remains useful despite current inadequacies.  PDP is also in the process of replacing its antiquated JMS database.  PDP is working with the developer of the replacement system to refine, computerize, and aggregate information that is currently only contained in dozens of standalone, manually generated reports.  The Monitoring Team is hopeful that the new system will improve data fidelity and is providing recommendations for how the updated system can aid in proving compliance.

In this reporting period, members of the Monitoring Team completed three site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside.[3]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Monitoring Team continues to meet regularly with PDP Commissioner Blanche Carney (Commissioner) and her staff and receives full access to facilities, documentation, personnel, and Class Members.  PDP remains transparent in providing information and collaborative in identifying solutions to deficiencies that impede compliance with the Agreement.  The Monitoring Team thanks the Commissioner and PDP staff for their contribution to the drafting of this report.  The Monitor also continues to meet with counsel for the parties and representatives from key stakeholder, advocacy, and oversight organizations and thanks them for their time and contribution to the Monitor's reports and findings.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.  The specific terms of the process by which documentation is shared were agreed upon by the Parties, approved by this Court on January 17, 2023, and the first set of documents were produced on January 25, 2023.[4]

---

[3] Site visits were conducted October 3-6, 2022, November 7-10, 2022, and December 1, 2022.  Additional site visits conducted January 6, 2023, and February 20-24, 2023, will be discussed in the Monitor's Third Report.

[4] Confidentiality Agreement, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 183 (E.D. Pa. Jan. 17, 2023).

# Table of Provisions

*Compliance Findings* ............................................................................................ 7

*Substantive Provision 1—Staffing* ..................................................................... 11

*Sub-provision 1.1* ............................................................................................. 11

*Sub-provision 1.2* ............................................................................................. 14

*Sub-provision 1.3* ............................................................................................. 14

*Sub-provision 1.4* ............................................................................................. 16

*Substantive Provision 2—Out-of-Cell Time* ..................................................... 18

*Sub-provision 2.1* ............................................................................................. 18

*Sub-provision 2.2* ............................................................................................. 19

*Substantive Provision 3—Out-of-Cell/Segregation* ......................................... 19

*Sub-provision 3.1* ............................................................................................. 19

*Sub-provision 3.2* ............................................................................................. 20

*Substantive Provision 4—Resume Normal Operations* ................................... 23

*Substantive Provision 5—Healthcare* ............................................................... 25

*Substantive Provision 6—Behavioral Health in Segregation* .......................... 33

*Substantive Provision 7—Law Library Access* ................................................ 38

*Substantive Provision 8—Discipline* ................................................................. 39

*Sub-provision 8.1* ............................................................................................. 39

*Sub-provision 8.2* ............................................................................................. 41

*Sub-provision 8.3* ............................................................................................. 41

*Sub-provision 8.4* ............................................................................................. 42

*Substantive Provision 9—Tablets* ..................................................................... 43

*Sub-provision 9.1* ............................................................................................. 43

*Sub-provision 9.2* ............................................................................................. 46

*Substantive Provision 10—Phone Calls* ........................................................... 47

*Sub-provision 10.1* ........................................................................................... 47

*Sub-provision 10.2* ........................................................................................... 47

*Substantive Provision 11—PICC Emergency Call Systems* ............................ 47

*Substantive Provision 12—Locks* ..................................................................... 48

*Sub-provision 12.1* ........................................................................................... 48

*Sub-provision 12.2* ........................................................................................................ 49

*Sub-provision 12.3* ........................................................................................................ 49

*Sub-provision 12.4* ........................................................................................................ 49

*Sub-provision 12.5* ........................................................................................................ 50

***Substantive Provision 13—Visiting*** .......................................................................... **50**

*Sub-provision 13.1* ........................................................................................................ 50

*Sub-provision 13.2* ........................................................................................................ 50

*Sub-provision 13.3* ........................................................................................................ 52

***Substantive Provision 14—Attorney Visiting*** .......................................................... **52**

*Sub-provision 14.1* ........................................................................................................ 52

*Sub-provision 14.2* ........................................................................................................ 53

*Sub-provision 14.3* ........................................................................................................ 53

***Substantive Provision 15—COVID-19 Testing*** ........................................................ **54**

***Substantive Provision 16—Quarantine*** .................................................................... **55**

***Substantive Provision 17—Sanitation*** ...................................................................... **57**

*Sub-provision 17.1* ........................................................................................................ 57

*Sub-provision 17.2* ........................................................................................................ 59

***Substantive Provision 18—Use-of-Force*** .................................................................. **60**

## Compliance Findings

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision.  In this reporting period, the Monitoring Team has created sub-provisions for some of the 18 substantive provisions based on these discrete action items and will be analyzing and issuing separate compliance findings for each enumerated sub-provision.  This will provide additional clarity for Defendants as they work to implement required changes and greater specificity for the Court and Parties in distinguishing between action items that are being successfully implemented and those that require additional attention.  To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.  The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures will continue until achieved and thereafter to maintain the proper number of correctional officers. | NC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis.  *See also* para. 4, *infra*. | NC |
| **3** | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| 4 | **Resume Normal Operations** | NC |
| | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| 5 | **Healthcare** | PC |
| | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| 6 | **Behavioral Health in Segregation** | PC |
| | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| 7 | **Law Library Access** | PC |
| | PDP will continue to provide law library access for all incarcerated individuals.  The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| 8 | **Discipline** | PC |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | PC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| **9** | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs.  The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| **10** | **Phone Calls** | **PC** |
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
|  | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | PC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | NC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **PC** |
|  | The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results.  Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health.  Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. |  |

| Provision | Requirements | Compliance Status |
|---|---|---|
| **16** | **Quarantine** | **PC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19.  Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands.  The parties agree that correctional officers should follow de-escalation measures provided in PDP policies.  The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors.  In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….  Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

## Substantive Provision 1—Staffing

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP will be unable to achieve substantial compliance with the Agreement until it can hire and retain sufficient personnel to cover all posts necessary to meet the needs of Class Members.[5]  To date, the City has not engaged the full-scale hiring effort recommended by the Monitoring Team.  The following table reflects PDP's reported changes in security and maintenance vacancies since the last reporting period:

---

[5] Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 8 (Nov. 4, 2022).

**Philadelphia Department of Prisons Vacancy Report**
September and December 2022

| | Position Classification | Budgeted | September 2022 | | December 2022 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1719 | 994 | 725 | 973 | 746 | +11 | 43% (+1%) |
| | Sergeants | 129 | 88 | 41 | 77 | 52 | +11 | 40% (+8%) |
| | Lieutenants | 56 | 39 | 17 | 46 | 10 | -8 | 16% (-14%) |
| | Captains | 31 | 24 | 7 | 24 | 7 | +1 | 26% (+3%) |
| | **Security Total** | **1935** | **1145** | **790** | **1130** | **805** | **15** | **42% (+1)** |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 5 | 3 | 0 | 38% |
| | Trades Worker II | 23 | 10 | 13 | 8 | 15 | +2 | 65% (+8) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% |
| | Building Engineer | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | **Maintenance Total** | **36** | **17** | **19** | **15** | **21** | **2** | **58% (+5)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 0 | 2 | +2 | 100% |
| | HR Program Admin | 2 | 2 | 0 | 2 | 0 | 0 | 0% |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% |
| | **HR Total** | **5** | **3** | **2** | **3** | **2** | **2** | **40%** |
| **PDP TOTAL** | **All Positions** | **2186** | **1346** | **842** | **1321** | **865** | **23** | **40%** |

The August 12, 2022, Arbitration Award provides for the hiring bonuses discussed in this sub-provision.[6]  Among positive hiring strategies in this reporting period, the City approved bonuses pursuant to the award, increased base salaries and longevity pay, provided for an additional day off each year, and increased uniform allowances.[7]  PDP also reports that the City initiated a contract to advertise job openings on billboards throughout the City, which reportedly began in mid-December 2022.

Unfortunately, Defendants' current hiring and academy schedules are insufficient to address PDP's reported 800 vacancies.  PDP reports that the City most recently accepted applications for a two-week period, closing on December 12, 2022.  This is inconsistent with the Monitoring Team's recommendation to allow continuous-fill hiring lists in order to maximize the number of applications received.

---

[6] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia
[7] The August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See Id.* at 3-9.

PDP data reflects that since February 2021, only 225 new staff have entered an academy.  Of the total 120 staff hired with academy graduation dates in the 2022 calendar year, 79 were still employed as of December 23, 2022, reflecting a 34 percent attrition rate within the first year of employment in 2022.  This rate will be used as a baseline from which to measure any progress in the 2023 calendar year.  The table below depicts academy schedules, attendance, and graduation data for 2021 and 2022 and first-year employee retention rates for 2022 academies:

### Philadelphia Department of Prisons Academy Report

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed on 12/23/22 | Retention Rate |
|---|---|---|---|---|---|
| 21-01 | Feb 22, 2021 - May 5, 2021 | 25 | 23 | N/A | N/A |
| 21-02 | June 28, 2021 - September 14, 2021 | 19 | 15 | N/A | N/A |
| 21-03 | August 16, 2021 - November 3, 2021 | 35 | 30 | N/A | N/A |
| 21-04 | November 8, 2021 -January 19, 2022 | 30 | 26 | 21 | 70% |
| 21-05 | December 20, 2021 - March 2, 2022 | 20 | 16 | 11 | 55% |
| 22-01 | March 21, 2022 - June 1, 2022 | 31 | 25 | 18 | 58% |
| 22-02 | May 2, 2022 - July 13, 2022 | 21 | 20 | 15 | 71% |
| 22-03 | August 1, 2022 - October 12, 2022 | 18 | 16 | 14 | 78% |
| 22-04 | October 31, 2022- January 20, 2023 | 26 | 20 | 20 | N/A |
| **Total** | **9 Academies** | **225** | **191** | **--** | **77%** |

Based on information provided, an average of approximately 8 percent of applicants complete the orientation, interview, and background check processes and are ultimately hired as PDP correctional officers.  Available data on recruitment yields is depicted in the following table:

### Philadelphia Department of Prisons Average Recruitment Yields

| Certification List | Total Applicants | Total Hired | Rate (%) |
|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 |
| 2021-0906 | 758 | 50 | 7.9 |
| 2022-0221 | 298 | 16 | 5.4 |
| 2022-0516 | 245 | 25 | 10.2 |
| **Total** | **1529** | **127** | **8.31** |

The City's efforts thus far do not reflect the aggressive strategy necessary to resolve PDP's staffing crisis.  Assuming 800 vacancies, an 8 percent recruitment yield, and a 34 percent first-year attrition rate, the City may need to attract more than 15,000 applicants to fill current vacancies.  Given the administrative burden of processing applications and training and onboarding new staff, any strategy would require some years to implement.  Thus far, the City's actions are not responsive to the enormity of PDP's staffing crisis and fail to acknowledge the duty imposed on Defendants by this Court to improve working conditions for more than 1,600 employees and reduce the suffering of more than 4,200 people confined in PDP facilities.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

### Compliance Rating:  Partial Compliance

The August 12, 2022, Arbitration Award also provided for step-based salary increases, retention bonuses, longevity pay, and other positive steps that support employee retention.[8]  Preliminary data suggests that bonuses and other incentives authorized pursuant to the August 12, 2022, Arbitration Award may correlate with a decline in average monthly attrition rates.  PDP's reported monthly average voluntary separations for 2019 through 2022, including job abandonment, are depicted in the following table:

| Average Voluntary Separations by PDP Employees | | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Pre-Arbitration Award (Jan-Aug 2022) | Post-Arbitration Award (Sep-Dec 2022) |
| Monthly Ave | 10 | 11 | 24.25 | 22.75 | 10.75 |

PDP reports that COVID-19 protocols and staffing shortages have significantly hampered PDP's employee wellness efforts.  PDP personnel have unanimously reported to the Monitoring Team that pre-COVID-19 employee wellness activities and programs were positive for morale and that their absence has been detrimental.  Because employee wellness and personnel retention are critical to resolving the current staffing crisis and because failures to retain staff negate hard-won recruitment gains, the Monitoring Team has recommended that PDP consider employee retention strategies beyond those implemented pursuant to the August 12, 2022, Arbitration Award.  The Monitoring Team is hopeful that attrition rates will continue to decline as a result of new monetary incentives, however, job satisfaction is not driven by compensation alone.  Current attrition rates, particularly of new hires, demand a robust employee wellness initiative and thoughtful evaluation of working conditions to identify any timeframes within which new hires need additional support.[9]

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

### Compliance Rating:  Non-compliance

In the first reporting period, the Monitoring Team utilized available data to approximate the reported 40 percent daily post vacancy rate in PDP facilities.[10]  It is unlikely that the rate has changed significantly in this reporting period because:  (1) the security vacancy rate has

---

[8] *Id.* at 4-6.
[9] The Monitoring Team has offered suggestions and the United States Department of Justice—National Institute of Corrections and other entities offer jail executives useful employee wellness resources.  *See Wellness for Corrections and Supervision Professionals,* National Institute of Corrections, *available at* https://nicic.gov/projects/wellness-for-corrections-and-supervision-professionals
[10] Monitor's First Report, *supra* note 5, at 8.

remained virtually unchanged, so there are no additional staff to fill vacant posts; (2) data provided regarding sick leave utilization show no marked improvement; and (3) the incarcerated population has remained static requiring PDP to operate the same number of housing units. To ensure that there are enough staff to fill all posts consistent with this substantive provision, PDP should utilize findings from the Monitoring Team's recommended staffing analysis to determine how many and which types of posts are required. Effective post vacancy tracking is critical in initially assessing and ultimately maintaining sufficient personnel to achieve substantial compliance.

Despite remaining in non-compliance with this requirement, PDP is making progress in the following areas:

- Arbitration and the Twelve-Hour Shift Initiative--the Twelve-Hour Shift Initiative was implemented on a trial basis pursuant to the August 12, 2022, Arbitration Award. Implementation was delayed by one month and began on October 3, 2022.[11] Based on the Monitoring Team's observations on site and discussions with PDP staff and executives, Class Members, and counsel, the initiative's implementation appeared hasty and some expressed frustration with how it was rolled out or with the initiative itself. A supplemental arbitration award issued on January 20, 2023, extends the 12-Hour Shift Initiative trial period through April 30, 2023. The Panel also directed the parties to develop a hybrid staffing model that allows for both 12 and 8-hour shifts as well as other directives attentive to the concerns of both parties.[12] A third supplemental arbitration award, issued January 27, 2023, prescribes significant pay increases for employees assigned to a 12-hour shift.[13] Despite the challenges, twelve-hour shifts are designed to reduce overall staffing needs and the Monitoring Team is hopeful that the initiative and other items awarded will prove successful.

- Staffing Analysis--In this reporting period, the Monitoring Team met with the City's consultants who are completing the staffing analysis discussed in the first report.[14] The consultants anticipate that the analysis will be completed in the next reporting period and PDP reports it should clarify how many positions and posts PDP requires to support a return to normal operations as required by the Agreement. A staffing analysis is

---

[11] The 12-Hour Shift Initiative trial period was ordered to begin by September 4, 2022. *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, December 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia ("Despite the direction by this Panel that the 12-Hour Shift Initiative be implemented on September 5, 2022, the implementation of the 12-hour shift at CFCF was delayed until October 03, 2022").

[12] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, January 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia ("the Panel has determined that the PDP shall implement a hybrid work schedule that includes both 12-hour and 8-hour shifts, and that balances the preferences of the workforce with the operational concerns of management, with the intent to stabilize attrition and improve short- and long-term concerns over employee recruitment, retention, attendance, and lateness").

[13] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

[14] Monitor's First Report, *supra* note 5, at 9.

consistent with the Monitoring Team's recommendation and the Monitoring Team will opine on any findings and recommendations that support compliance once it is completed.

- Technical Assistance--Further analysis of PDP's current post plans, TeleStaff reports, and other data confirmed previously reported deficiencies and revealed a need for technical support for PDP personnel in tracking post vacancies and improving staffing data collection and analysis. In this reporting period, the Monitor retained an additional subject matter expert to assist PDP staff and executives in maximizing TeleStaff capabilities and improving PDP's internal monitoring of staffing issues. In late December 2022, PDP implemented a pilot program utilizing updated TeleStaff coding and trained its hiring staff in the new coding system. PDP reports that it will expand the pilot to other facilities once training and coding are refined. Monitoring staffing needs is complex, and PDP requires additional internal expertise to oversee its staffing system. The Monitoring Team has recommended that PDP retain its own expert to refine its systems and budgetary processes associated with staffing allocations.

Additional areas that require the City's attention include workers' compensation and PDP's sick leave utilization rates. The City is responsible for engaging return-to-work strategies for staff who are out for extended periods or work-related injuries. Documentation provided indicates that there were nearly 100 employees off duty on long-term leave as of PDP's last count. The City should initiate a return-to-work strategy that is specifically tailored to the needs of PDP personnel.

PDP's high sick leave utilization rates persist and continue to limit its ability to fill current jail posts. The August 12, 2022, Arbitration Award provides for a $500 bonus for staff who do not utilize sick leave in the preceding quarter. The $500 bonus amount may not be sufficient motivation for personnel with high burnout levels to significantly reduce PDP's sick leave utilization rates. This is also true given unlimited opportunities for staff to work overtime shifts, which may offset the loss of a quarterly bonus. However, the January 27, 2023, Arbitration Award provides for an additional attendance bonus for those assigned to a 12-hour shift, which should provide additional incentive to report to work. A bonus structure is progress, and the Monitoring Team will continue to track sick leave utilization.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

### Compliance Rating: Non-compliance

A partial or substantial compliance rating first requires PDP to achieve compliance with sub-provision 1.3.

Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

*The Monitor met with the Philadelphia City Manager and Deputy Finance Director on February 2, 2023. The City committed to take action on this recommendation, however, as of the filing of this report, contracts have not been expanded and some PDP facilities remain in dangerous disrepair.*

2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.

    *As of the filing of this report, Defendants have taken no action to implement this recommendation.*

3. Retain a qualified recruitment firm to assist in guiding the city's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

    *As of the filing of this report, Defendants have taken no action to implement this recommendation.*

4. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

    *In this reporting period, the Monitor met with consultants retained by Defendants to, among other tasks, complete the above recommended staffing analysis. The Monitoring Team has reviewed a draft and has requested additional information. The final report is expected to be completed in the next reporting period.*

5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

    *PDP reports that it has initiated contact with labor organizations to address this issue. As of the filing of this report, this recommendation has not been implemented.*

6. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

    *As of the filing of this report, the City has taken no action to implement this recommendation. However, the supplemental arbitration award issued December 8, 2022, refines the August 12, 2022, award to, effective January 1, 2023, eliminate the City's residency requirement for AFSCME Local 159B (Union) members/civil service employees with five or more years of service.[15] The City reports that it is implementing the award consistent with Civil Service Commission rules.*

Additional Recommendations regarding Substantive Provision 1—Staffing this reporting period:

7. PDP should implement strategies for employee retention and a robust employee wellness program.

8. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

---

[15] Bill no. 200363, Section 20-101 of The Philadelphia Code (passed June 25, 2020), *available at* https://phila.legistar.com/View.ashx?M=F&ID=8611128&GUID=2216D7C4-6DD5-4235-A23B-88C7F3C3A25E

9. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations.  The expert should assist PDP in identifying and retaining only the most useful staffing reports and discontinuing the use of non-essential or inaccurate reports.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

#### Compliance Rating:  Partial Compliance

PDP continues to report deficiencies in ensuring that Class Members receive opportunities to recreate, shower, make phone calls, attend family or legal visits, and other activities outside of their cells for minimum daily timeframes required in the Agreement.  The Monitor previously reported that PDP's out-of-cell time tracking mechanisms are methodologically flawed and inadequate and the Monitoring Team remains unable to (1) establish an accurate baseline of current out-of-cell opportunities for Class Members, or (2) to determine the extent to which Agreement deadlines and benchmarks have been met.

PDP acknowledges that despite offering out-of-cell opportunities most weeks, most PDP housing units are not consistently offering the required five hours out-of-cell time daily and none are offering 6 hours out-of-cell time daily.[16]  This is consistent with the Monitoring Team's impressions based on discussions with Class Members and PDP personnel during site visits in this reporting period.  It is also consistent with reports from civilian oversight and reform advocates who enter PDP facilities or speak with Class Members.

As previously reported, PDP is making efforts to procure a radio frequency identification (RFID) system that tracks information electronically and reduces errors resulting from manual information entry.  An RFID system will allow PDP to accurately track how much time Class Members spend outside of their cells and improve accountability for failures to provide out-of-cell opportunities.  It will also allow the Monitoring Team to measure compliance with this substantive provision and several others that require movement of Class Members through PDP facilities, such as family and official visiting and access to medical care.  RFID will also assist

---

[16] PDP's analysis is based on available out-of-cell time documentation, including Deputy Warden Reports. Although Deputy Warden Reports are unreliable for Agreement compliance determinations, PDP's critical self-assessment and reporting of compliance failures are commendable.  PDP acknowledges that it has struggled to maintain public trust and positive working relationships with reform and advocacy partners.  PDP reports that is committed to increasing public trust and improving these working relationships.  Because transparent self-reporting of systemic deficiencies is critical to reform, the Monitoring Team is encouraged by PDP's commitment to improving in this area and has recommended that efforts continue.

with measuring the provision of structured treatment activity and equitable access to law library and tablets. Most importantly, RFID will reduce current workloads of personnel who must manually track services and increase their ability to focus on providing them.

PDP initially reported that it may be able to enter into a cooperation agreement with another City department that currently uses RFID. A cooperation agreement would allow PDP to avert the City's lengthy procurement process and the Monitoring Team recommended that the City prioritize the processing of the cooperation agreement or new RFID procurement. As of the filing of this report, the City had not implemented this recommendation.

In the interim, the Monitoring Team recommended that PDP replace its current out-of-cell tracking system with a spreadsheet tracker developed in consultation with the Monitoring Team. Though not ideal, a spreadsheet system is more accurate than the current system and can be standardized across all PDP facilities and housing units. Standardization will allow the Monitoring Team and PDP leadership to verify samples of documented out-of-cell times through housing unit CCTV review. It will also improve data reliability and allow the Monitoring Team to begin to identify an out-of-cell compliance baseline. PDP reports that it piloted the spreadsheet tracker in February 2023.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

### Compliance Rating: Non-compliance

Because PDP is currently unable to achieve the 4- and 5-hour out-of-cell benchmarks consistently, it is necessarily unable to meet 6, 8, or 10-hour benchmarks. The Monitor defers recommendations for future out-of-cell benchmarks or deadlines until PDP establishes a reliable baseline of current out-of-cell practices.

## Substantive Provision 3—Out-of-Cell/Segregation

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

### Compliance Rating: Partial Compliance

PDP reports that segregation units are not consistently offering the required one-hour out-of-cell time each day. Some segregation units are offering out-of-cell opportunities for longer than one hour on some days and some are offering one hour on most days, but PDP is not

meeting the one-hour daily requirement.  PDP also acknowledges that Class Members on some units receive no out-of-cell opportunities for extended periods up to 50 percent of the time. PDP's self-assessment is consistent with the Monitoring Team's impressions based on discussions with Class Members and PDP personnel during site visits in this reporting period. The spreadsheet tracking system that PDP is currently piloting should produce a more reliable baseline of out-of-cell opportunities in segregation units until an RFID system can be implemented.

In the meantime, the Monitoring Team and others who work in or enter PDP facilities have observed first-hand the injury inflicted on Class Members as a result of extended isolation.  Class Members have reported experiencing depression, hopelessness, suicidal thoughts, and visual or auditory hallucinations, among other symptoms.  The Monitoring Team has observed Class Members displaying behaviors such as pacing, pleading with passers-by to open cell doors, anger, crying, and lashing out, or experiencing symptoms including confusion, despondence, unwillingness or inability to engage, incessant muddled communication or talking to oneself, or psychiatric decompensation requiring hospitalization.  Tension on PDP housing units is consistently high, and use of force incidents have resulted when effects of isolation have caused Class Members to attempt to force their way out of cells or refuse to return to them.

Out-of-cell time is key to Class Members' well-being and to maintaining institutional stability. Class Members need a schedule that is shared with them in advance and that they can depend on to plan daily activities and attend to personal needs.  Housing unit schedules that are consistently followed, even if they afford fewer than required out-of-cell opportunities, can begin to reduce harm experienced by Class Members and improve the housing unit climates.

As PDP continues to work on a new, more reliable tracking system for out-of-cell time in all PDP housing units, PDP executives and managers should focus on:

1. Providing daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met.  PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.[17]
2. Ensuring that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
4. Documenting the reasons for any failures to offer out-of-cell time.

*Sub-provision 3.2--Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

---

[17]  SME Terri McDonald opines that it is typically safe to move most restricted housing unit populations in restraints with two officers, assuming incarcerated persons can be transitioned to the shower, phone, law library, and recreational yard with the area then secured and restraints removed.

**Compliance Rating:  Partial Compliance**

PDP prohibits placing Class Members in administrative segregation for any reason other than those necessary to maintain institutional safety, and placements must be based on documented case-by-case analyses.  As with the previous reporting period, documentation reviewed in this reporting period does not identify a lack of housing space or staffing as stated rationales for placement of individual Class Members into administrative segregation.

In the first reporting period, a high percentage of reevaluations for retention on administrative segregation were not occurring within 60- and 90-day policy timeframes, and punitive segregation placements were exceeding allowable timeframes.[18]  These conditions may be exacerbated by housing or staffing issues, however, PDP documentation reflects improvements in both areas.

The following table depicts reported total numbers of Class Members in administrative segregation, hearings exceeding 60- and 90-day timeframes, and average lengths of stay in administrative segregation for sample dates over six months between July 2022 and December 2022:

**Reviews for Retention on Administrative Segregation Exceeding 60 and 90 Days and Average Lengths of Stay**
July 2022 – December 2022

|  | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Total Ad-Seg | > 60 Days | > 90 Days | % >60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 60 Days | > 90 Days | % >60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 7-1-22 | 60 | 20 | 27 | 78% | 133 | 76 | 6 | 2 | 11% | 78 | 17 | 71 | 153 | 99 |
| 8-5-22 | 80 | 0 | 8 | 10% | 127 | 60 | 1 | 5 | 10% | 88 | 19 | 89 | 159 | 107 |
| 9-2-22 | 99 | 12 | 4 | 16% | 102 | 73 | 1 | 4 | 7% | 66 | 23 | 55 | 195 | 84 |
| 10-7-22 | 89 | 16 | 7 | 26% | 93 | 102 | 1 | 2 | 3% | 49 | 18 | 75 | 209 | 68 |
| 11-4-22 | 115 | 8 | 16 | 21% | 89 | 89 | 1 | 1 | 2% | 52 | 20 | 58 | 224 | 72 |
| 12-2-22 | 124 | 1 | 8 | 7% | 99 | 67 | 0 | 0 | 0% | 53 | 28 | 50 | 219 | 81 |

*RCF reviews were all completed within policy according to documentation reviewed.

The timeliness of administrative segregation reviews appears to have improved at both CFCF and PICC since the first report.  At CFCF, the percentage of reviews for retention on administrative segregation that failed to occur within policy guidelines reduced from 78 percent in July 2022 to 7 percent in December 2022 and, at PICC, from 11 percent of cases in July to 0 cases in December.  RCF cases in the sample selected were all completed within policy timeframes.  Additionally, the average time Class Members spent in administrative segregation decreased at CFCF from 133 days in July to 99 days in December.  These are positive trends.  Unfortunately, the total number of Class Members placed in administrative segregation increased

---

[18] Monitor's First Report, *supra* note 5, at 13.

by 30 percent from July to December.  This increase may be partially explained by a reported reduction over the same period in average lengths of disciplinary sentences reflected in the table below:

**Punitive Segregation: Total Placements and Average Lengths of Stay**
July 2022 – December 2022

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 7-1-22 | 100 | 89 | 24 | 110 | 27 | 34 | 151 | 99 |
| 8-5-22 | 65 | 98 | 34 | 89 | 36 | 44 | 135 | 82 |
| 9-2-22 | 58 | 87 | 56 | 71 | 65 | 34 | 179 | 63 |
| 10-7-22 | 56 | 37 | 50 | 53 | 64 | 32 | 170 | 39 |
| 11-4-22 | 52 | 38 | 71 | 39 | 39 | 59 | 162 | 44 |
| 12-2-22 | 33 | 30 | 59 | 27 | 36 | 18 | 128 | 25 |

PDP data shows on July 1, 2022, Class Members spent an average of 99 days in punitive segregation.  Average lengths of stay decreased each month thereafter to an average of 25 days on December 2, 2022, representing a 75 percent decrease in average punitive segregation sentences.  CFCF also appears to have made progress in reducing the number of Class Members sentenced to punitive segregation terms, from 100 on July 1, 2022, to 33 on December 2, 2022.  These are also positive trends.  It may be that after some Class Members complete their punitive segregation terms, they are reclassified to administrative segregation, which may explain the overall increase noted above.

PDP data suggests that it continues to segregate approximately 10 percent of its incarcerated population.  SME Terri McDonald opines that, based on national trends, PDP should reduce its use of segregation to no more than 3 to 6 percent of its population on average.  Reductions in lengths of stay and segregation placements at some facilities reflect significant progress and the Monitoring Team is encouraged both by PDP's receptivity to recommendations in this area and its efforts thus far to reduce its reliance on segregation.

The Monitoring Team also previously reported that lack of available Transition Unit (TU) housing for Class Members on the behavioral health caseload is likely contributing to some segregation placements in violation of the Agreement.  This issue is discussed below under Substantive Provision 6—Behavioral Health in Segregation.

PDP will see additional reductions by narrowing its requirements for placement and retention in segregation.  Among other changes, PDP has agreed to review its use of punitive segregation for non-violent infractions, such as possession of contraband, or those that are related to behavioral health diagnoses.  PDP is also reviewing its systematic segregation of Class Members who are

sentenced to state prison or have "high profile" cases.[19]  These Class Members and others could be more appropriately housed in one of PDP's high-security, non-segregation environments.

Finally, PDP is still working to resolve the issue of identifying any Class Members who may be "segregated in place," meaning they are on segregation status outside of designated segregation housing areas.  The Monitoring Team has recommended against this practice, and PDP reports that it has been discontinued.  The Monitoring Team requires additional information and further review of PDP's housing unit tracking systems to verify these statements.  Ongoing communication issues between security and healthcare also continue to present challenges ensuring that all Class Member patients who are on segregation status receive services pursuant to Provision 6—Behavioral Health in Segregation below.

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating:  Non-compliance**

PDP reports that it is not prepared to submit a plan for a return to normal operations that includes additional out-of-cell time and access to other services and programs as required by the Agreement.[20]  It reports that it has convened an internal committee pursuant to the August 12, 2022, and December 8, 2022, initial and supplemental arbitration awards and is working on a plan that is intended to address some staffing issues.  PDP reports that while it is able to make some operational improvements with existing staffing resources, it cannot provide a date by which it will be able to return to normal operations.

The Monitoring Team has had frequent discussions with PDP regarding barriers to compliance with all substantive provisions of the Agreement.  The Monitoring Team has recommended that

---

[19] See additional discussion regarding segregation of state sentenced Class Members below under Substantive Provision 6—Behavioral Health in Segregation.

[20] The Monitoring Team is working with PDP to ensure that "normal operations" is defined according to evidence based best practices at the time PDP is prepared to implement them.

Defendants refrain from unrealistic reform projections, some of which have resulted in patterns of non-compliance. All reform efforts should be designed to ensure durability and effectiveness.

Defendants have acknowledged that they are non-compliant with the requirements of this substantive provision due to PDP's staffing crisis, as discussed under Substantive Provision 1—Staffing.[21] Defendants also acknowledge that they are not in substantial compliance with the requirements for out-of-cell time pursuant to Substantive Provision 2—Out-of-Cell Time, and Substantive Provision 3—Out-of-Cell/Segregation, all due to insufficient staffing.[22]

Accordingly, if the City fails to implement the Monitor's recommendations pursuant to Substantive Provision 1—Staffing and take all appropriate action within its authority to address PDP's staffing vacancies, it will be required to "provide specific reasons for non-compliance to the Plaintiffs and the Monitor" and, failing that process, "Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions."[23]

PDP's staffing crisis will likely require years to resolve. As such, the only other path to compliance with the Agreement is to reduce PDP's population to a level commensurate with staffing resources. PDP estimates that it would need to reduce its population by approximately 800 Class Members to improve manageability and achieve meaningful reform.[24]

The Monitor has continued to discuss population reduction issues with the Parties and Philadelphia's criminal justice partners. There is agreement that reductions in PDP's population can be achieved through greater efficiency and improvements to existing criminal justice processes and population reduction initiatives. Enhancements to the procedures for bail review and consistent review of cases where individuals are detained on minor or technical violations of probation or parole are two such interventions. Removing financial barriers and reevaluating rigid eligibility restrictions for those who might otherwise be safely released on electronic monitoring is another. Expediting processing and transfers to substance abuse treatment programs and other settings as alternatives to incarceration would also be productive.

Justice partners who spoke with the Monitor continue to assert that greater criminal justice reform is necessary to achieve more than a fraction of the 800 Class Member reductions cited by PDP. Justice partners also correctly note, however, that even nominal reductions may ease operational burdens and improve conditions for some Class Members. The Monitor will continue to report on population reduction issues as they impact Defendants' compliance with the Agreement.

---

[21] *See also* Monitor's First Report, *supra* note 5, at 9.

[22] The Monitor accepts PDP's "partial compliance" self-assessment pending PDP's implementation of a reliable out-of-cell tracking system.

[23] Settlement Agreement, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 165 at 2 (April 12, 2022).

[24] PDP's projection is based on cursory analysis of current staffing and population numbers. The formula for identifying a precise population reduction goal requires complex population and staffing projections, and will vary depending on the success of Defendants efforts to improve recruitment and retention rates, among other variables.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating:  Partial Compliance**

To achieve substantial compliance with the substantive provision, PDP must: (1) reduce its backlog to no more than 238, or 15 percent of 1,587; (2) continue efforts to reduce any remaining backlog; and (3) ensure that any solutions are designed and implemented to continue to address the remaining backlog and to sustain any reductions achieved.[25]  In this reporting period, PDP security and healthcare staff continued their efforts to reduce backlogs and have begun to implement some of the Monitoring Team's recommended improvements, however, staffing shortages and on-going COVID-19 protocols continue to impact compliance.  The current backlog remains significant and is not yet approaching the required 15 percent of the originally estimated backlog of 900 from March 2021, or the 1,587 backlog that will be used for compliance determinations.

PDP endeavors to keep reliable healthcare data and has been receptive to recommended improvements.  However, current healthcare staffing shortages can result in large week-to-week fluctuations in on-site appointment backlog data if, for example, even one provider is absent for one week or works overtime another.  Therefore, compliance with this substantive provision will be based in part on data for weekly backlog averages over time.  The table below depicts average weekly on-site appointment backlogs, by appointment type, over two four-week periods in October/November 2022, and November/December 2022:

---

[25] In July 2022, PDP began tracking backlogged appointments in all facilities and made other changes to its tracking methodology to achieve greater specificity.  The July 2022 backlog data for all facilities, including all appointment types, was 1,587.  This total includes 1,242 on-site general medical and behavioral health appointments (July 22, 2022), 104 on-site specialty appointments (July 22, 2022), and 241 off-site specialty appointments (July 18, 2022).

| Appointment Type | Average Weekly Backlog 10/25/22 - 1/15/22 | Average Weekly Backlog 11/22/22 - 12/13/22 | % Change (+/-) |
|---|---|---|---|
| **Average Total Backlog** | **1840** | **1439** | **-22%** |
| BH Initial Psychiatric Evaluation | 30 | 24 | -19% |
| BH Medication Evaluation | 64 | 71 | 11% |
| BH Social Work Sick Call | 18 | 17 | -8% |
| BH SW SCTR | 0 | 2 | * |
| Chronic Care Follow-up | 275 | 274 | 0% |
| Chronic Care Initial | 149 | 87 | -41% |
| MAT | 179 | 136 | -24% |
| MAT Follow-up | 2 | 7 | * |
| Provider Sick Call | 61 | 48 | -22% |
| RN Sick Call | 142 | 54 | -62% |
| Re-Entry Planning | 920 | 719 | -22% |

*Average percent change not calculated for averages appointments <50

The two four-week timeframes analyzed reflect a 22 percent reduction in the average healthcare appointment backlog.  Reductions occurred in all appointment types except Behavioral Health Medication Evaluations, with an average increase of 11 percent from the first four-week period to the next.  The greatest average backlog reductions were achieved in Registered Nurse Sick Call (by 62 percent), Chronic Care Initial Evaluations (by 41 percent), and MAT appointments (by 24 percent).  The total on-site appointment backlog remains high at more than 1,000 appointments in any given week, but reductions are trending positively.

The largest percentage of the backlog remains Reentry Planning appointments, a designated set of meetings between healthcare administrative staff and chronic care and Medication Assisted Treatment (MAT) patients to assist in post-release care.  Supported reentry is key to population reduction and recidivism prevention, and post-release continuity of care is essential to successful reentry.  Although reentry appointments do not have the same on-site patient care impact as other appointment type backlogs, PDP is correct in tracking them and should maintain a focus on reentry planning.

On-site specialty appointments continue to represent a small percentage of the overall backlog and PDP has made progress in this area since the previous reporting period.[26]  Between August 4, 2022, and December 8, 2022, PDP's weekly average of on-site specialty appointment backlogs reduced from 121 to 63, or by 48 percent.  On-site specialty backlog data is also susceptible to large fluctuations based on minor staffing changes, but reductions in this reporting period are likely significant enough to reflect a reliable positive trend.  PDP reports that it has also made efforts to expand the pool of on-site specialists and increase the presence of current on-site specialists.

---

[26] As previously reported, PDP offers on-site specialty services in optometry, orthopedics, pap testing, podiatry, physical therapy, ultrasound, and x-ray.  For on-site specialty appointments, community provider/specialists go to PDP and treat patients on-site.

Some types of specialty appointments are only offered off-site, and patients must be scheduled with and transported to outside providers to receive care.  In the first reporting period, the Monitoring Team reported that PDP data for off-site appointment backlogs showed a reduction of 33 percent from 276 backlogged appointments to 187.  These figures were reported based on data that included the total of off-site appointments that were not yet eligible for scheduling and, therefore, were not backlogged.[27]  PDP healthcare is implementing recommended improvements to its tracking methods to control for this appointment type.  The Monitoring Team will use updated data to measure compliance going forward.

In this reporting period, PDP has also created more uniform categories to measure reasons for missed *off-site* appointments.  PDP data from the first reporting period showed that 56 percent, or 147 of 262 patients made it to their scheduled off-site appointments in the month of July 2022.  The table below reflects scheduled and attended appointments in September through December 2022:

**Off-Site Specialty Appointment Summary**
September 2022 - December 2022

|  | September | October | November | December |
|---|---|---|---|---|
| **# Scheduled** | **348** | **336** | **353** | **366** |
| Out of Custody | 58 | 18 | 59 | 58 |
| Out of Jurisdiction/Open Ward | 6 | 38 | 4 | 6 |
| Cancelled Prior to Transport | 10 | 11 | 11 | 17 |
| COVID-19 Isolation | 3 | 1 | 1 | 1 |
| **# Eligible to Attend Appointment** | **271** | **268** | **278** | **284** |
| Refused | 44 | 31 | 20 | 34 |
| Correctional Officer Shortage | 31 | 63 | 31 | 45 |
| Cancelled by Provider | 6 | 1 | 6 | 5 |
| Scheduling Error | 3 | 5 | 7 | 2 |
| Court | 4 | 3 | 4 | 5 |
| Late to Appointment | 7 | 2 | 4 | 3 |
| Other | 11 | 2 | 5 | 5 |
| Total Not Seen | 106 | 107 | 77 | 99 |
| Total Seen | 165 | 161 | 201 | 185 |
| **% Eligible Patients Seen** | **61%** | **60%** | **72%** | **65%** |

PDP's efforts to improve off-site appointment attendance and tracking are proving successful, with attendance increasing from 56 percent in July 2022, to 65 percent in December 2022.

---

[27] For example, outside treatment providers may order one-year follow-ups but their offices may not allow scheduling more than some months in advance.  The Monitoring Team recommended that PDP continue to track dates at which follow-up appointments can first be scheduled with off-site providers and include those appointments in backlog totals once those dates have passed.

Security staff shortages and patient refusals remain the most frequent reasons for non-attendance. During site visits in this reporting period, the Monitoring Team met with several patients who were documented as refusing to attend off-site appointments.  The most common reason for refusals cited by patient Class Members was having to wait too long on the day of scheduled appointments.  Class Members who spoke with the Monitoring Team reported being awakened pre-dawn and waiting hours in holding areas for transport to appointments that were not occurring until the afternoon.  Patients reported wanting to attend the appointments but growing tired of waiting, ultimately requesting to return to their housing units over attending appointments.

In the first reporting period, the Monitoring Team recommended that PDP create an interdisciplinary workgroup consisting of security and healthcare personnel to improve coordination of transports to off-site appointments and other points of access to healthcare.[28] PDP reports in November 2022 Commissioner Carney convened a weekly Access to Care Workgroup (Workgroup) for this purpose.  The Workgroup includes the Commissioner, the Chief of Staff, the Chief of Medical Operations and YesCare management, the Deputy Commissioner for Operations, wardens/deputy wardens, shift commanders, and movement captains.  PDP reports that improvements identified by the Workgroup have enhanced coordination of medical transports and off-site appointment attendance reported above.

The Workgroup is also focused on increasing the number of Class Member patients seen by healthcare despite security and healthcare staffing challenges.  PDP reports that the Workgroup directed changes in security staff coverage so that breaks do not impede healthcare appointments, modified some clinic schedules to accommodate security staffing schedules, and directing that facility population counts not interrupt healthcare services.  The Workgroup should also consider looking more closely at patient refusals with the goal of improving attendance.  These are positive steps, and the Monitoring Team will continue to work with PDP to identify additional efficiencies that may be gained despite the staffing crisis.

Given the Workgroup's success, the Monitoring Team has recommended that it also convene following each Class Member patient death in PDP facilities.  Critical incident reviews following in-custody deaths are fundamental to identifying any lapses in security or healthcare that require additional investigation or corrective action.  In 2022, 10 Class Member patients died in PDP facilities.  These deaths included three suicides, four substance overdoses, and two deaths from natural causes, one of which was identified as COVID-19 related.  One cause of death is still pending.

PDP completes investigations following each death, which the Monitoring Team has reviewed and determined require significant improvements.  Robust interdisciplinary reviews that include analysis of healthcare and security emergency responses and care leading up to and during a Class Member patient's death will improve PDP policies and procedures.  Reviews that include transparent and self-critical analysis by both healthcare and security personnel will improve

---

[28] Monitor's First Report, *supra* note 5, at 13.

coordination of care and possibly prevent future deaths.  Effective corrective action plans that are implemented and tracked can improve patient care and jail operations.  The Monitoring Team is assisting PDP in formalizing its in-custody death critical incident reviews and will report any progress.

PDP continues to struggle to meet its goal of completing Class Member patient intake screenings within four hours of arrival.  In the first reporting period, data for the week ending August 6, 2022, showed that the four-hour timeframe was only being met 40 percent of the time.  In this reporting period, PDP provided data for intake screenings completed within four-hours based on averages for each month of 2022, reflected in the following table:

**Percentage of Intake Screenings**
**Within Four Hours**
Monthly Averages 2022

| | |
|---|---|
| January | 15% |
| February | 39% |
| March | 34% |
| April | 65% |
| May | 55% |
| June | 56% |
| July | 50% |
| August | 54% |
| September | 44% |
| October | 32% |
| November | 48% |
| December | 44% |

April 2022 data shows that PDP met its four-hour goal an average of 65 percent of the time, its highest for the year.  At the lowest, January 2022 data reflects that screenings were completed within four-hours an average only 15 percent of the time.  PDP reports that it has adequate healthcare staffing to meet the four-hour requirement but that security staffing, essential to escorting Class Member patients to screening appointments, is often inadequate.

**Behavioral Healthcare**

In this reporting period, PDP developed a new Healthcare Performance Indicator Report that tracks timeframes for behavioral health referrals and care on monthly bases.  PDP data for 2022 suggests that behavioral health struggled to complete patient referrals within their required timeframes.[29]  PDP reports that delays were largely due to COVID-19 protocols, limited Class Member patient movement, and healthcare and security staffing shortages, which required the

---

[29] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: Emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

triaging and prioritizing of referrals for emergency care over urgent and routine referrals.  The following table depicts reported rates of compliance with policy timeframes for behavioral health referrals for each month of 2022:

### Percent Compliance with Behavioral Health Referral Timeframes
2022

| Month | Total Completed Referrals | % All Referrals Completed Within Policy Timeframes | % Emergency Referrals Completed Within 4 Hours | % Emergency Referrals Completed Within 24 Hours | % Urgent Referrals Completed Within 24 Hours | % Routine Referrals Completed Within 5 Days |
|---|---|---|---|---|---|---|
| January | 718 | 68% | 82% | 100% | 61% | 36% |
| February | 688 | 69% | 81% | 100% | 44% | 67% |
| March | 660 | 60% | 77% | 100% | 31% | 48% |
| April | 634 | 58% | 76% | 99% | 33% | 42% |
| May | 630 | 69% | 83% | 100% | 44% | 57% |
| June | 658 | 62% | 74% | 100% | 46% | 45% |
| July | 688 | 58% | 74% | 99% | 35% | 47% |
| August | 811 | 57% | 71% | 100% | 36% | 55% |
| September | 841 | 56% | 76% | 99% | 29% | 58% |
| October | 787 | 55% | 74% | 100% | 24% | 62% |
| November | 627 | 68% | 79% | 100% | 44% | 74% |
| December | 602 | 59% | 76% | 91% | 29% | 53% |

* Expectation: Emergent within 4 hours, Urgent within 24 hours, Routine within 5 days

Behavioral health referrals were completed within their required timeframes on average 62 percent of the time in 2022.  Though clinicians struggled to see emergency referrals within the required four-hour time frame, they were consistently able to see patients within 24 hours, likely at the expense of urgent and routine referrals.  Urgent referrals were completed within policy timeframes only 39 percent of the time on average and routine referrals 54 percent of the time on average.

Social Worker Sick Calls, or Class Member patient-initiated referrals/requests, should be seen within 24-hours of receipt.  The data reflect that PDP was able to meet this goal 75 percent to 86 percent of the time from June 2022 through November 2022.  Finally, all Class Members entering PDP are referred for a 14-day evaluation to be completed by behavioral health staff. PDP data indicate that 14-day evaluations occurred as required from 78 percent to 97 percent of the time from June through December 2022, with consistently high compliance rates of 90 percent or higher beginning in September 2022, as reflected in the following table:

## Compliance with 14-Day Evaluations
June 2022 – December 2022

| Month | Number Completed | % Completed within 14 Days |
|---|---|---|
| June | 736 | 78% |
| July | 712 | 78% |
| August | 882 | 84% |
| September | 821 | 92% |
| October | 832 | 96% |
| November | 754 | 93% |
| December | 682 | 97% |

## Healthcare Staffing

PDP continues to cite inadequate custody and healthcare staffing as the most significant factors preventing the decrease in the healthcare appointment backlog. Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime staff or temporary agency hires. The following table reflects healthcare staff and functional vacancy rates in December 2022:

## Healthcare Vacancy Report
December 2022

| Position Category | Allocated FTE | Unfilled FTE | FTE Vacancy Rate | Functional Vacancy Rate |
|---|---|---|---|---|
| Administration | 50.0 | 1.00 | 2.00% | 12% |
| Behavioral Health Aide | 9.0 | 1.00 | 11.11% | -9% |
| Behavioral Health Clinicians: Lic. Social Worker/Psychologist | 25.1 | 11.70 | 46.61% | 48% |
| Behavioral Health Prescribers: Psychiatrist, NP | 16.6 | 6.20 | 37.35% | 26% |
| Behavioral Health Professionals: BH Coun./Activity Therapist | 17.2 | 2.00 | 11.63% | 30% |
| Certified Nursing Assistant | 2.8 | 1.40 | 50.00% | 52% |
| Dialysis RN and Dialysis Technician | 1.6 | 0.00 | 0.00% | 9% |
| Infectious Disease Physician | 2.0 | 0.00 | 0.00% | 37% |
| License Practical Nurse: All LPNs | 64.6 | 26.40 | 40.87% | -19% |
| Medical Assistant | 19.0 | 6.20 | 32.63% | -2% |
| Medical Records Clerk/UM Clerk/Secretary | 18.8 | 2.0 | 10.64% | 27% |
| OB/GYN Physician | 0.8 | 0.00 | 0.00% | 82% |
| Optometrist | 0.8 | 0.8 | 100.00% | 86% |

31

| | | | |
|---|---|---|---|
| Physical Health Clinicians: Physician, NP, PA | 17.2 | 1.60 | 9.30% | 0% |
| Physical Therapist and Physical Therapist Assistant | 3.0 | 3.00 | 100.00% | 40% |
| Telehealth Coordinators | 2.0 | 2.00 | 100.00% | 50% |
| Radiology Technician | 2.4 | 1.40 | 58.33% | 71% |
| Registered Nurse: All RNs | 72.2 | 28.40 | 39.34% | 22% |
| **Total** | 325.1 | 95.10 | 29.25% | 14% |

In August 2022, PDP reported a staff vacancy rate of 33 percent and a functional vacancy rate of 14 percent.  In December 2022, PDP data reflects an overall vacancy rate of 29 percent, or 95 of 325 positions, and a functional vacancy rate of 14 percent, reflecting little change since the first reporting period.  Staffing of behavioral health clinician positions is especially challenging, with a functional vacancy rate of approximately 48 percent.  It is unlikely that PDP will be able to comply with the Agreement requirement for adequate and timely mental health care without a large influx of additional behavioral health staff.

PDP healthcare also continues to struggle to hire and retain staff.  During the four-month period from September through December 2022, PDP was able to hire 14 full-time employees but lost 15, resulting in a net loss of 1 full-time employee in the same period.  As previously reported, long-term reliance on overtime and agency staffing negatively impacts healthcare operations and the quality of care provided and prevents reduction of the current backlog.  Hiring and separation data are reflected in the following table:

**Healthcare Personnel New Hires and Separations by Job Classification**
September, October, November, December 2022

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 3 | 1 | +2 |
| Licensed Clinical Social Worker | 2 | 1 | +1 |
| Behavioral Health Registered Nurse | | 2 | -2 |
| Psychiatrist | | 1 | -1 |
| Behavioral Health Counselor | 1 | | +1 |
| Regional Re-Entry Coordinator | 1 | | +1 |
| Nurse Practitioner | 2 | 1 | +1 |
| Registered Nurse | | 1 | -1 |
| Licensed Practical Nurse | 1.4 | 4.2 | -2.8 |
| Medical Assistant | .4 | 2 | -1.6 |
| Certified Nursing Assistant | 1 | | +1 |
| X-Ray Technician | | 1 | -1 |
| Medical Records Clerk | .4 | 1 | -.6 |
| Physical Therapist | 1 | | +1 |
| Administrative Assistant | 1 | | +1 |
| **Total** | **14.2** | **15.2** | **-1** |

PDP reports that it has developed a plan to increase healthcare salaries to a more competitive level, which will hopefully attract new and permanent employees.

Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's First Report:

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.
   *The City has not engaged an independent salary survey. Instead, it worked with YesCare to obtain regional healthcare salary data and developed and submitted a proposal to increase staff salaries by an average of approximately 8 percent initially. If implemented, this increase would bring salaries nearly commensurate with those in the community. The Monitoring Team has recommended additional increases to ensure that PDP salaries are competitive regionally and they promote the hiring of additional full-time staff.*
2. Continue to explore options to provide both on and off-site appointment services via telehealth.
   *PDP reports that YesCare is beginning to request meetings with off-site specialists who see a higher number of Class Member patients and explore their willingness participate in telehealth visits. The Monitoring Team has requested an update in the next reporting period. PDP also reports that it plans to engage in negotiations to determine if an orthopedic provider can be made available for on-site appointments.*
3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.
   *The Workgroup was formed in November 2022 and meets weekly to address both on-site and off-site appointment issues. Both security and healthcare staff participate and report it has led to positive changes.*

## Substantive Provision 6—Behavioral Health in Segregation

*By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units.*

### Compliance Rating:  Partial Compliance

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation (segregation) status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI; (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient

Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

Consistent healthcare rounding in isolated settings is the most effective means to identify patients in medical or behavioral health distress and to ensure that patient Class Members are not harmed in or require removal from segregation.  PDP conducts regular audits to track medical rounds and continues to report lapses in segregation rounding.  The Monitoring Team has reviewed PDP's audit methods and determined that they are generally sound.  However, the Monitoring Team will not use PDP's audit findings for compliance determinations until PDP ensures that all Class Member patients on segregation status are tracked and healthcare staff are notified of every patient in need of rounds.  Notifications must occur in real time and the Monitoring Team must be able to verify that PDP healthcare audits include all patients on segregation status.  PDP reports that the issue is close to resolution.  If so, the Monitoring Team anticipates being able to test the tracking system during site visits in the next reporting period.

The Monitoring Team has on-going concerns about the quality of behavioral health rounds, based on observations during site visits of Class Member patients who appeared to be in acute psychiatric distress and held in segregation units for weeks or months.[30]  Some Class Member patients were too acute for isolated segregation environments and should have been flagged for removal to higher levels of care.[31]

*Requirement 2:  Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Member patients being considered for placement on segregation status. Clearances require a face-to-face evaluations by a physical healthcare provider and a behavioral health clinician for those on the behavioral health caseload.  Patients who are designated SMI require a behavioral health clearance within four-hours of placement. Patients who are on the behavioral health caseload but not identified as SMI require a behavioral health clearance within 24-hours of placement on segregation status.  As with requirements one and three above, the Monitoring Team is unable to verify PDP's audit findings regarding the timeliness of behavioral health clearances while above-described issues with segregating in place persist.

---

[30] Monitor's First Report, *supra* note 5, at 21-22.
[31] *Id.* at 22.

Regarding the quality of behavioral health clearances, they do not appear to be meeting policy requirements, as discussed in the Monitor's First Report.[32]  In this reporting period, SME Dr. Belavich reviewed a sample of 14 behavioral health clearance forms for SMI Class Member patients placed in segregation.  Of clearances reviewed, all patients identified as SMI were cleared without documented consideration of their ability to safely serve time in segregation, their ability to understand and participate in the discipline process, or any need for reducing the penalty imposed if the patient's mental illness had a role in the reported violation.  In the sample reviewed, clearances occurred despite clinical notes on the same form indicating that patients were acting bizarrely or experiencing potentially severe mental health symptoms.

These findings are consistent with the Monitoring Teams observations of patients and discussions with behavioral health personnel during site visits in both reporting periods.[33]  Discussions with behavioral health personnel during site visits suggest that clinical thresholds for placement in segregation are too high and that some patients who are cleared for segregation should not be.  Behavioral health, and all PDP healthcare personnel, have now endured years of extraordinary pressure.  Due to critical staffing shortages, PDP's healthcare staff have a dramatically multiplied workload in treating ever-increasing physical and behavioral health needs of more than 4,200 patients.  They must do this while simultaneously managing restricted population movement and instituting aggressive testing, vaccination, quarantine, and isolation protocols to limit the spread of COVID-19.  SME Dr. Belavich notes that fatigue and efforts to increase efficiency may be contributing to higher placement thresholds for some of PDP's more acute placements.

Speaking with behavioral health staff during site visits, they clearly committed to the care of Class Member patients.  Issues with the quality of patient contacts, immediately apparent in the context of segregation rounding and clearances, are not merely the result of poor clinical decision-making on the part of a few providers.  Rather, SME Dr. Belavich has recommended that the Behavioral Health Program as a whole review and recalibrate its segregation practices and level-of-care thresholds.  As discussed in the Monitor's First Report, SME Dr. Belavich also indicates that improvements must be supported by a similar commitment from PDP's security executives and staff.  As noted above, PDP executives have committed to reviewing security segregation practices, and the Monitoring Team is hopeful that consistent interdisciplinary communication via the workgroup will result in parallel program improvements.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP previously reported that it worked with YesCare to develop "Positive Change/Positive Outcomes," a behavioral health group treatment program for those in segregation.  The program

---

[32] *Ibid*. PDP policy includes extensive discussion of ensuring protections for those who are navigating SMI from the potential harms associated with segregation.  Specifically, policy prohibits the punishment of Class Members for experiencing SMI symptoms and requires the suspension of disciplinary hearings for those who are unable to participate due to SMI.

[33] *Id.* at 21-22.

is designed for delivery five days per week, two hours each day, for a total of 10 possible treatment hours weekly. PDP initially expected the program to be fully operational and serving all Class Members by the end of October 2022. It now reports that it did not meet the October 2022, goal and that efforts to implement the program are ongoing.

PDP reports that clinical staff are available to deliver group services, however, they have yet to designate consistent space to hold groups and security personnel to staff them. PDP reports that it can offer the program mornings and evenings on one unit at PICC but that some evening groups are cancelled due to security personnel shortages. On another PICC unit, PDP has not yet identified space to hold groups because it is currently closed for maintenance and repairs. Because repair and maintenance closures at PICC and other facilities not covered by the contract maintenance provider are typically protracted, there is no way to know whether or when the unit may reopen, and program space may be designated. At CFCF, PDP reports that program patient/participants have been identified, but as of December 2022, security staff shortages prevented implementation. At RCF, Class Members were being interviewed for participation in the program as of December 2022. Group programming is integral to treatment on segregation units. It promotes adaptive coping skills and allows staff to monitor participants' mental health status. SME Dr. Belavich notes that without therapeutic programming, patients in segregation are more likely to decompensate or commit additional infractions, often in direct response to isolative conditions.

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

As discussed above, PDP is attempting to ensure that all Class Member patients on segregation status are identified and tracked.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

As previously reported, PDP decreased Transition Unit beds due to COVID-19.[34] By August 2022, they had reduced by 83 percent for females from 64 cells to 11 cells and by 44 percent for males, from 100 cells to 56 cells. The re-establishment of a robust Transition Unit program as well as expansion with additional beds for patients with mental health and behavioral issues in lieu of segregation is crucial. PDP agrees with expansion as an alternative to segregation for patients whose mental illnesses as well as behaviors associated with disciplinary infractions can be best addressed as part of treatment goals in a therapeutic housing environment.

PDP is making efforts to expand Transition Unit housing, but progress has been slow. Females who were previously housed in a smaller Transition Unit, were transferred to a larger unit, reportedly with the goal of creating more bed space. During the site visit in October 2022, the Monitoring Team observed that the new female Transition Unit space was also housing Class

---

[34] *Id.* at 23.

Members who were not Transition Unit patients. Because Class Members with different security or medical classifications are not permitted to be in common areas together, Transition Unit patients were reportedly receiving limited out-of-cell time and programming.

The Monitoring Team observed a similar issue on the men's Transition Unit at PICC. Approximately 66 Transition Unit patients were mixed with general population Class Members, which limited out-of-cell opportunities for everyone in the unit. The Monitoring Team also observed maintenance and sanitation issues on the unit, including food encrusted on living unit walls, shattered glass in a broken door that is used by Class Members and staff, a shattered television screen, and unsanitary conditions in common areas and patients' cells. Again, unlike CFCF and RCF, PICC's maintenance issues are reportedly not being addressed due to maintenance staffing shortages.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Class Member patients who are designated SMI or are on the behavioral health caseload continue to be overrepresented in segregation compared to the total PDP population. On December 30, 2022, the total census for PDP was 4401. Of this population, 35 percent were on the behavioral health caseload and 12 percent were designated SMI. There were 311 Class Members listed on segregation status, of which 44 percent were on the behavioral health caseload and 12 percent were designated SMI.

PDP has not historically tracked whether patients may be safely diverted from segregation to more appropriate treatment environments. Behavioral health personnel confirm that the only available alternative to placement in segregation is inpatient hospitalization, which is reserved for only the most acute patients. Absent Transition Unit or other safe options, some patients with serious mental illness who are experiencing serious symptoms and commit infractions as a result are being placed in segregation. PDP is developing a tracking system that will supply monthly reports of diversions from segregation to Transition Units or inpatient hospitalization.

The Monitoring Team reviewed behavioral health information for Class Members who were in segregation based solely on their criminal matters resulting in state prison sentences. On December 30, 2022, there were 20 Class Members on the state sentenced list. Nine of them were on the behavioral health caseload and three were designated SMI. These patients spent between 2 and 150 days, or an average 25.25 days in segregation. As discussed above, PDP is reevaluating its placement criteria for all Class Members, and this population is a good example of behavioral health patient overrepresentation in segregation. Patients should not be placed on segregation based solely on behavioral health status, charges or case disposition, non-violent infractions, or higher security needs. Each patient should instead be evaluated individually with consideration given to symptom acuity and current institutional behavior.

Recommendations:

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
2. PDP should make additional progress in identifying personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

During site visits in the first reporting period, the Monitoring Team observed law library locations and equipment and spoke with Class members and staff about issues with access.[35] Law library access had resumed in some locations, but equipment failures and lack of out-of-cell opportunities continued to limit access.  PDP was receptive to the Monitoring Team's recommendations regarding law library scheduling, tracking, and equipment maintenance and has made progress in improving access in non-segregation units in this reporting period. PDP has standardized its processes for law library sign-up as well as tracking which Class Members attend law library and any reasons for non-attendance.  PDP reports that the pilot is fully operational and ready to be formalized into policy for non-segregation units.  Segregation units remain without a tracking system for law library access and segregated Class Members continue to receive sporadic access.  PDP also reports that a law library schedule on non-segregation units has not been developed due, in part, to fluctuating out-of-cell time opportunities related to ongoing high post vacancies.  PDP anticipates that the 12-hour shift schedule will improve compliance with out-of-cell and law library requirements on segregated and non-segregated housing units.  PDP agrees with the Monitoring Team that a firm schedule, even one that offers fewer than desired law library opportunities, is important for consistency and accountability.  PDP and has committed to identifying a feasible but consistent schedule for all units in the next reporting period that Class Members should be able to depend on in planning their daily activities.

During site visits in both reporting periods, Class Members continued to note law library equipment failures.  In October 2022, PDP began to track computer and printer functionality and provided documentation for the Monitoring Team's review.

---

[35] Monitor's First Report, *supra* note 5, at 24.

The following table reflects reported issues identified at each facility and dates of any documented repairs in October, November, and December 2022:

**PDP Internal Law Library Equipment Audit**
October, November, December 2022

| Month | Equipment | ASD | CFCF | DC | PICC | RCF | Total | Housing Unit Tour Dates | Repairs Completed |
|---|---|---|---|---|---|---|---|---|---|
| Oct 2022 | Computers | 0 | 0 | 1 | 0 | 0 | 1 | 10/14/22-10/25/22 | 10/26/22 |
| | Printers | 0 | 1 | 0 | 2 | 1 | 4 | | |
| Nov 2022 | Computers | N/A | 0 | 0 | 2 | 0 | 2 | 11/14/22-11/22/22 | Unknown |
| | Printers | N/A | 0 | 0 | 0 | 0 | 0 | | |
| Dec 2022 | Computers | 0 | 1 | 0 | 1 | 0 | 2 | 12/15/22-12/22/22 | 12/27/22 |
| | Printers | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Total** | | **0** | **2** | **1** | **5** | **1** | **9** | | |

Based on documentation provided, it appears that some repairs are taking longer than necessary, however, PDP has committed to continue to track equipment failures and improve repair turnaround. During the Deputy Monitor meetings with Class Members in this reporting period, some Class Members reported incremental improvements in law library access. Others reported ongoing issues with inconsistent or officer-dependent access.

Equitable access to law library for all Class Members remains an area of concern. Proving that everyone who wants to attend law library receives access is more challenging than measuring attendance itself. A well-designed law library schedule, personnel briefings, and post orders regarding equitable access are among the proactive steps that the Monitoring Team has recommended. PDP reports that it continues to work to resolve this issue and the Monitoring Team will update the Court in future reports.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating:  Partial Compliance**

PDP's disciplinary policies, forms, and training curricula require revisions to comply with established due process and Agreement requirements. First, they must reflect the requirement that a Class Member who is the subject of a disciplinary hearing must be present at the hearing unless the Class Member waives attendance. Second, PDP must ensure that effective communication is established during the disciplinary process. For example, PDP should have a consistent mechanism to identify Class Members who are non-English speaking or who have

39

developmental or learning disabilities or hearing or vision impairments and ensure that they receive assistance as needed and that all necessary accommodations are made.  The policy implies that support may be provided, however, disciplinary reporting forms only include an option to flag Class Members on the behavioral health caseload but none of the additional categories listed above.  There is also no formal process to confirm that effective communication was established throughout the disciplinary process.  PDP policy requires disciplinary clearances for behavioral health Class Member patients but not for those with developmental disabilities or other vulnerable populations.

The Monitoring Team reviewed a sample of "Medical/Behavioral Health Review for Segregation Placement" forms.  Forms reflected consistent identification of Class Member patients on the Behavioral Health Caseload or as SMI, however, they were not always completed and, at times, information on the forms is inconsistent with PDP's disciplinary hearing database.  As noted above under Substantive Provision 6—Behavioral Health in Segregation, regardless of behaviors in question or Class Member patients' symptoms recorded by the reviewing clinician, all forms noted no contraindications to segregation placement and no issues with patients' abilities to understand and participate in the disciplinary process.

The following table depicts PDP's disciplinary hearing data from July-December 2022, including totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

**PDP Disciplinary Hearings Including Discipline Issued, Not Guilty, Dismissed, and Present at Hearing**
July – December 2022

| Month | Total Discipline Issued | Total Not Guilty | % Not Guilty | Dismissed | % Dismissed | SMI | % SMI | Sample % SMI Guilty comply w Policy | Guilty without a hearing | % Guilty without hearing |
|---|---|---|---|---|---|---|---|---|---|---|
| July | 200 | 11 | 6% | 10 | 5% | N/A | N/A | N/A | N/A | N/A |
| August | 330 | 20 | 6% | 63 | 19% | N/A | N/A | N/A | N/A | N/A |
| Sept | 238 | 21 | 9% | 13 | 5% | 23 | 10% | 0% | 4 | 2% |
| Oct | 213 | 7 | 3% | 31 | 15% | 23 | 11% | 0% | 9 | 4% |
| Nov | 325 | 18 | 6% | 41 | 13% | 48 | 15% | 0% | 9 | 3% |
| Dec | 300 | 38 | 13% | 23 | 8% | 43 | 43% | N/A | 5 | 2% |
| Total/ Average % | 1606 | 115 | 7% | 181 | 11% | 137 | 13% | 0% | 27 | 3% |

PDP's data suggests that an average of 7 percent of disciplinary hearings between July and December 2022, resulted in "not guilty" findings.  An average of 11 percent were dismissed in the same period, most often because either hearings were not conducted within required timeframes or disciplinary reports were incomplete and never reissued.  In an average of three percent of cases, discipline was imposed without Class Members present at the hearings not having waived attendance, discussed under sub-provision 8.3 below.

The Monitoring Team has ongoing concerns about the quality of PDP's disciplinary investigations, adjudications, the frequency with which Class Members are disciplined, and placements in and durations of post-discipline segregation.  It is positive, however, that PDP hearing officers both make some "not guilty" determinations and dismiss some cases for failures to meet documentation or investigative requirements.  This team's work should be acknowledged, and the Monitoring Team has recommended that the disciplinary hearing officer team attend national trainings on best practices for ensuring due process proceedings for Class Members.  Trainings should include protections pursuant to the Americans with Disabilities Act.  The hearing officer team should also be supported in conducting internal audits and drafting PDP's disciplinary and administrative segregation policy revisions consistent with established due process requirements and correctional best practices.  Finally, the Monitoring Team has recommended additional improvements to the disciplinary tracking system that will produce trend data and assist in reducing PDP's reliance on formal discipline to manage PDP's Class Member population.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

### Compliance Rating:  Substantial Compliance

In the first reporting period, PDP indicated that it was nearing compliance with this Agreement requirement having expunged disciplinary records in 4,217 cases by October 2022.  In total, PDP reports that 4,312 disciplinary records were expunged for Class Members who were not present during hearings from March 2020, through December 2022, beyond the April 12, 2022, Agreement date.  During site visits in this reporting period, SME McDonald reviewed case files of 158 Class Members, and confirmed that all 158 cases were documented as expunged.

SME McDonald's review of cases also revealed that, in three percent of cases, between September and December 2022, disciplinary penalties were documented despite other records indicating that Class Members were not present for hearings because they were either at court or had been released.  PDP executives report that a directive was reissued to discontinue the practice and the additional records were expunged.  SME McDonald confirmed that additional expungements were logged for all cases consistent with Agreement timeframes.  The Monitoring Team will continue to check disciplinary records in subsequent reporting periods to ensure that the practice has not reoccurred.  In addition to any corrective action taken, PDP policy and disciplinary forms and documentation must be updated, personnel must be retrained, and Class Members must be notified of any changes.  PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring this aspect of Substantive Provision 8—Discipline.

*Sub-provision 8.3—[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Partial Compliance**

In the first reporting period, PDP reported that all Class Members who were eligible for release from segregation pursuant to this substantive provision had been released.  To verify this information, the Monitoring Team has cross-referenced two types of documentation: (1) the disciplinary and administrative segregation lists generated in April, August, October, and December 2022, and (2) lists of reported expunged disciplinary cases completed by PDP since April 2022.  As with other PDP data limitations, the hand generated weekly segregated tracking report has shown errors.  Figures reported below may be approximations and require on-site individual file review to validate.

The weekly segregated placement list for April 15, 2022, reflects a total of 383 Class Members in administrative or punitive segregation.  Cross-referenced with the expungement lists, 192 of 383 had at least one disciplinary disposition expunged.  When monitoring of this issue was initiated in August 2022, PDP reported that Agreement requirements to remove Class Members from segregation and expunge disciplinary dispositions were both in progress.  The August 19, 2022, weekly segregation placement report reflects 107 Class Members remained in a segregated housing unit since at least April 15, 2022.  Forty-eight of 107 had at least one disciplinary disposition expunged.

On October 4, 2022, PDP executives certified that all Class Members who required release from segregation were released and that all required expungements were complete.  The October 7, 2022, weekly segregation placement report reflects 29 Class Members remained in segregation since at least April 15, 2022, 12 of whom also had at least one disciplinary disposition expunged.[36]  Because classification actions are not maintained in JMS, determining whether retention on segregation is connected to an expunged discipline requires on-site individual Class Member file review.  All but one of the 12 Class Members who were on both lists appear to have been retained on segregation for reasons unrelated to the expunged disciplinary dispositions.  This will be confirmed through file review. The reason for the remaining Class Member's retention in segregation is still being researched.

The December 23, 2022, weekly segregation placement list, compared with JMS and the expunged cases list, reflects 17 Class Members who had remained on segregation since at least April 15, 2022, 12 of whom also had at least one disciplinary disposition expunged and is nearly identical to the October list.  The Monitoring Team will verify whether listed Class Members were retained on disciplinary or administrative segregation based on discipline that was imposed without a proper hearing.

*Sub-provision 8.4—[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and*

---

[36] When compared against JMS, the weekly segregation list contained several names of Class Members who had been released prior the October 7, 2022, list date.

*discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance**

In the first reporting period, PDP reported that it had reimbursed Class Members for 238 of 279 financial sanctions that had been imposed improperly as of October 4, 2022, totaling more than $27,000.  As noted above, PDP's initial list of 279 cases that required reimbursement excluded cases in which Class Members were not present at hearings that resulted in the imposition of penalties because they had been released, were out to court, or were not present for other reasons.  PDP revised its methods and has now provided the Monitoring Team with documentation of a total of 406 reimbursements or trust account holds that were lifted for a combined total of $38,787.81.

In this reporting period, SME McDonald reviewed a sample of 52 disciplinary files, 100 percent of which reflected reimbursements or lifted trust account holds.  PDP reports that a small number of reimbursements could not be made to Class Members who had been released from PDP custody and whose forwarding addresses could not be verified.  Their PDP files, however, continue to reflect that reimbursements are owed.

PDP reports that none of the nearly 4,500 expunged cases were reheard.  This is consistent with the Monitoring Team's findings and SME McDonald's review of 158 disciplinary files described above under sub-provision 8.2, none of which reflected new hearings or reissued discipline.  PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring this aspect of Substantive Provision 8—Discipline.

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022.[37]*

---

[37] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units). . .".*  In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor

**Compliance Rating:  Partial Compliance**

PDP provided documentation indicating that since April 2022, it has installed an additional 181 tablet docking stations for a total of 427 stations and corresponding tablets that should also be available for use by Class Members.  PDP reports that it has reserved an additional 183 tablets for educational programming.  The following table reflects tablet totals at each PDP facility based on documentation provided:

**Tablet Availability at Each
PDP Facility**
December 2022

| Facility/Housing Unit | Total Tablets December 2022 |
|---|---|
| ASD Total | 12 |
| MOD 3 Total | 12 |
| CFCF Total | 198 |
| DC Total | 60 |
| PICC Total | 60 |
| RCF Total | 85 |
| **Total** | **427** |

Documentation provided indicates that PDP has exceeded agreement requirements at CFCF. PDP reports a total of 188 tablets and docking stations at CFCF, at least six in each housing unit, and PDP reports that it maintains ample tablets in inventory to replace any that become nonoperational.  PDP reports a total of 72 tablets and docking stations at RCF, reflecting an increase of 50 tablets, which exceeds the Agreement requirement by 24 tablets.  The following tables reflects tablet totals in housing units at CFCF and RCF based on documentation provided:

---

housing units and from six to eight on the first-floor housing units to achieve substantial compliance with this aspect of the substantive provision.

**Tablet Totals: CFCF**

December 2022

| Housing Unit | Total Tablets December 2022 |
|---|---|
| CFCF - A1 | 20 |
| CFCF - A2 | 24 |
| CFCF - B1 | 24 |
| CFCF - B2 | 24 |
| CFCF - C1 | 24 |
| CFCF - C2 | 24 |
| CFCF - D1 | 24 |
| CFCF - D2 | 24 |
| **Housing Unit Total** | **188** |
| CFCF – Legal | 10 |
| **CFCF TOTAL** | **198** |

**Tablet Totals: RCF**

December 2020 and 2022

| Housing Unit | Total Tablets December 2022 |
|---|---|
| RCF – A - 1st floor | 8 |
| RCF – B - 1st floor | 8 |
| RCF – C - 1st floor | 8 |
| RCF – D –1st floor | 8 |
| RCF - E - 2nd floor | 10 |
| RCF – F - 2nd floor | 10 |
| RCF – G - 3rd floor | 10 |
| RCF – H - 3rd floor | 10 |
| **RCF Housing Unit totals** | **72** |
| RCF – Law Library | 13 |
| **RCF TOTAL** | **85** |

The Monitoring Team has observed the construction of docking stations and observed their presence in housing units during site visits. The greater and more important challenge for PDP is ensuring that at least as many tablets as docking stations are issued, charged, maintained in good working condition, and made available for use by Class Members. During site visits in this reporting period, the Monitoring Team again observed Class Members using tablets on housing units but also observed units with no tablets in use or fewer tablets than required by the Agreement.

PDP reports that it is developing a tablet policy that will establish clear expectations for unit personnel in managing tablet maintenance access. PDP's efforts to expand tablet access have been largely successful but ensuring that tablets are available requires a clear policy and post orders, interim directives as necessary, and system-wide staff training. The Monitoring Team

has also recommended that PDP consider utilizing its internal auditing team to conduct quarterly audits on tablet availability and access for housing unit personnel to ensure they are issued consistently.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

PDP reports that it is currently exploring expanding tablet capabilities to include the submission of Class Member requests and grievances. PDP program staff are currently utilizing tablets for in-cell therapeutic self-help programming and PDP is working with a vendor so that sick call requests can be submitted via tablets as well.[38] These are all positive developments.

PDP and the Monitoring Team are concerned that PDP may not be able to ensure equitable access to available tablets. Class Members have reported to the Monitoring Team during site visits that access to tablets is sometimes limited by housing unit "politics" or other issues. In two instances in segregation units, the Monitoring Team noted Class Members using tablets in their cells who had reportedly refused to return them as directed, limiting access for others.

Significantly, PDP is evaluating the feasibility of issuing tablets to all Class Members. PDP executives recognize that physical plant limitations, personal privacy issues, and many other considerations pose substantial challenges, but they remain hopeful that they can be overcome and are discussing strategies in consultation with counsel and the Monitoring Team. If PDP determines that issuing tablets individually is infeasible, a tablet sign-up system is the next best option to support equitable access. However, given existing challenges for overwhelmed housing unit staff in ensuring out-of-cell time and access to phones, law library, and other

---

[38] PICC has 66 tablets and CFCF has 117 tablets reserved for therapeutic programming.

services, the Monitoring Team has recommended against increasing housing unit workloads wherever possible for the time being.  The Monitoring Team is encouraged by PDP's efforts in this area.

## Substantive Provision 10—Phone Calls

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP's current policy regarding phone access has not been updated to reflect Agreement requirements, however, the required fifteen minutes of free phone calls have been implemented system-wide.  Unit personnel are required to monitor phone usage and ensure equitable access, however, the Monitoring Team doubts that unit personnel are consistently meeting this policy requirement given the current staffing crisis.  Some Class Members have reported to the Monitoring Team during site visits that, like tablets, phone access is at times limited based on housing unit politics or more assertive Class Members who maintain unofficial control.  Class Members have reported tension on housing units as a result, which can contribute to institutional violence.

The greatest barrier to equitable phone access remains limited out-of-cell time and access to living unit dayrooms, also related to the staffing crisis.  In efforts to assess individual Class Member phone usage, PDP reports that it is exploring whether initiated calls can be tracked and randomly sampled.  Alternatively, individually issued tablets may be configured to replace unit telephone calls, which would be a more feasible and more effective path to equitable access.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

### Compliance Rating—Non-compliance

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not yet have a plan for the return to normal operations and is therefore non-compliant with this sub-provision.

## Substantive Provision 11—PICC Emergency Call Systems

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team has toured PICC and discussed the installation of cell-based emergency call systems as well as additional phones and tablet docking stations with PDP's executive and maintenance teams.  The Monitoring Team agrees that PICC's profound maintenance and other physical plant challenges render the cell and control booth modifications necessary to install a call system unadvisable.  For reasons previously reported, the Monitoring Team recommends against the expansion of the call button system to PICC as currently designed, irrespective of physical plant capacity.[39]  Given the ineffectiveness of the call button system, PICC's current policy of completing safety checks every 30 minutes at staggered intervals is likely a more effective option.  The quality and timeliness of the safety checks are issues and the Monitoring Team has recommended greater vigilance and CCTV spot checks.

Regarding expansion of tablets at PICC, SME McDonald inspected PICC's housing units and recommends against the installation of additional docking stations for tablet-based visits.  PICC's physical plant configuration does not allow for additional tablet docking stations without creating privacy issues for housing unit residents or tablet-based visitors.  Regarding the installation of additional phones at PICC, SME McDonald notes that currently installed phones are positioned close to one another, and that the facility has little unencumbered space for placement of additional units.  Like other PDP facilities, phone access is most limited by inconsistent out-of-cell opportunities for Class Members.  Should PDP expand its tablet program to issue tablets with phone capabilities to each Class Member, this issue would be largely resolved.  Existing phones should remain in place at PICC and all PDP facilities if some Class Members are restricted from using tablets or prefer traditional phone calls, or if tablets are unavailable.

The Monitoring Team will revisit this substantive provision and consider additional recommendations once PDP makes a determination about the broad distribution of tablets or is closer to the return to normal operations.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . .which will be completed by June 30, 2022.*

**Compliance Rating:  Partial Compliance**

In the first reporting period, PDP had replaced more than 900 locks system-wide and reported that it needed to replace an additional 27 locks at PICC.  In this reporting period, PDP reports that it has replaced an additional 11 locks, however the remaining 16 cells require the installation of new door frames to accommodate them.  PDP has not provided an anticipated completion date yet and those cells remain unoccupied.  An additional 34 cells require replacement of the lights that notify personnel when doors are secure.  In the meantime, personnel must rely on security checks for this safety function.  Bulb replacements are another example of simple routine

---

[39] Monitor's First Report, *supra* note 5, at 27-28.

maintenance that suffers due to City maintenance personnel shortages. As long as PICC must rely on City maintenance personnel rather than PDP's existing contract maintenance for these repairs, they are certain to remain safety issues for personnel and Class Members.

PDP reports that PICC staff received training on lock inspection and tampering in 2021. PICC post orders require cell inspections and the submission of work orders for all repairs. As previously reported, PDP has a policy governing facility captains' responsibilities in overseeing the lock and key protocols, however, housing officer post orders reviewed do not expressly direct staff to perform lock inspections prior to completion of the lock inspection inventory sheet. Current post orders also do not contain specific steps that personnel must take when locks are nonoperational (such as remove occupants and secure their property), and the Monitoring Team has recommended these and other revisions.

*Sub-provision 12.2-- PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

### Compliance Rating: Partial Compliance

As previously reported, PDP indicates that lock replacement was completed in May 2022 and that RCF personnel completed training in September 2021. Post orders include language about lock inspections and tampering. Once recommended post order revisions described above under sub-provision 12.1 are added to post orders, PDP will achieve substantial compliance with this sub-provision.

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

### Compliance Rating: Substantial Compliance

In the first reporting period, PDP provided documentation of completed testing and repairs of call buttons prior to April 2022. The Monitoring Team has not received recent complaints of call button failures and invariably observes blinking call button requests on control panels in all housing units during every site visit. Responsiveness to call buttons and effectiveness of the call button system remain serious concerns. PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 12–Locks.

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

### Compliance Rating: Partial Compliance

PDP's work order system is used to address both nonoperational call buttons and locks. PDP has provided copies of work orders, and repair logs reflecting timely repairs at RCF. PDP has not provided copies of work orders or repair logs for CFCF since monitoring initiated. The

Monitoring Team presumes the system is in place but requires documentation to verify CFCF's practices and make a compliance determination.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

### Compliance Rating:  Substantial Compliance

PDP provided documentation that it completed two rounds of refresher training on call button responses at CFCF and RCF.  The first training was completed in April 2022 and was conducted in briefings over a one-week period in both facilities.  Following consultation with the Monitoring Team, PDP conducted additional rounds of trainings that were more narrowly tailored to operations at each facility.  The second round of trainings was completed by November 2022.  PDP has achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 12 –Locks.  For any training to be effective, it must be consistent with policy, however, there is no reference to CFCF or RCF call buttons systems in current post orders.  Personnel continue to report to the Monitoring Team during site visits that they understand their responsibility to submit work orders for broken call buttons, however, these requirements must be incorporated into policy or facility post orders for greater accountability.

### Substantive Provision 13—Visiting

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members.  PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

### Compliance Rating:  Substantial Compliance

As previously reported, PDP initially resumed in-person visiting in November 2021, but suspended it between January and March 2022, due to a COVID-19 surge.  On March 24, 2022, PDP resumed in-person visits and increased the number of available visiting slots consistent with the Agreement.  PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 13—Visiting.

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

### Compliance Rating:  Partial Compliance

50

In-person visits are scheduled online by selecting from available visiting slots in a scheduling portal on a webpage that also outlines visiting rules.[40]  The website is available in both English and Spanish and may also be accessed via smartphone.  Limitations in PDP's current tracking and data system make it difficult to monitor the visiting program's effectiveness.  For example, it does not currently track no-shows or when Class Members refuse visits.  It is also not possible to track how long visitors or Class Members have waited for visits to begin or reasons for last-minute cancellations.  These and other issues have been reported to the Monitoring Team during site visits in both reporting periods and are consistent with findings reported by oversight and other advocates.

PDP acknowledges ongoing issues with its visiting program and inconsistency in scheduling, cancellations, and attendance.  Despite limitations in PDP's data and tracking systems, existing visiting data may be useful in establishing a baseline from which to analyze trends and make some recommendations for improvements.  An RFID system and updated JMS database will assist with tracking scheduling and attendance.  PDP has provided some visiting data, however, large fluctuations in totals reported require additional on-site review to clarify.  Once the Monitoring Team is confident in the information provided and in its understanding of visiting practices and program barriers, it will apprise the Court and recommended improvements.  The Monitoring Team has recommended that PDP not finalize visiting policy revisions pending the Monitoring Team's assessment.

In addition to pending tracking and policy recommendations, the Monitoring Team has recommended that PDP analyze filled versus unfilled in-person visiting timeslots and adjust visiting schedules to better accommodate working families and students.  The Monitoring Team has also recommended that PDP address other barriers to visiting such as parking and ADA accessibility issues.  Finally, most of PDP's visiting areas are sterile and institutional.  Visiting loved ones who are incarcerated is stressful, and families are often fearful or apprehensive.  The Monitoring Team has recommended changes to the visiting processing and meeting areas that are designed to reduce stress and create a calmer environment for visitors, children, and Class Members.

Wardens should personally attend and observe some visiting arrivals, welcome families, and invite them to participate in conversations about improving services.  Families and Class Members offer invaluable suggestions for improvements that others may not think of, but which may be easily implemented and improve the visiting experience for everyone.  Wardens and visiting staff should request feedback from Class Members about their experiences and implement requested changes whenever possible.  The work of dedicated visiting personnel who spend the most time with visiting families and Class Members during visits should be recognized.  Visiting personnel could be assigned to reimagine visiting protocols and explore opportunities for immediate improvements.  Because PDP leadership is juggling competing

---

[40] Visit an Incarcerated Person, CITY OF PHILADELPHIA (last updated on August 30, 2022), *available at* https://www.phila.gov/services/crime-law-justice/prisons-incarcerated-people-and-returning-citizens/finding-and-contacting-incarcerated-people/visit-an-incarcerated-person/#:~:text=Appointments%20for%20visits%20are%20first-come%2C%20first-served.%20You%20

priorities, delegating these responsibilities to personnel would allow them to begin implementation immediately and increase staff buy-in to changes. Improving the visiting environment and protocols is a comparatively simple task that can yield extraordinary outcomes for the effort invested.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

### Compliance Rating:  Non-compliance

PDP reports that it has had a system in place since the beginning of the COVID-19 pandemic that allows the Regional Infection Control Coordinator to verify any individual's vaccination status in the City's composite record. This has reportedly allowed PDP to verify visitors' vaccination status. The Monitoring Team is awaiting documentation that verifies PDP's assertion and will provide updates once it is received. As of December 2022, proof of vaccination is no longer required for Class Members or their visitors pursuant to changes in PDP's COVID-19 protocols outlined in a memorandum issued by the Commissioner.

## Substantive Provision 14—Attorney Visiting

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

### Compliance Rating:  Partial Compliance

It appears that language in this sub-provision reflects a miscommunication during settlement negotiations about the process for attorney visiting. Specifically, the reference to ensuring attorneys' access to clients within 45 minutes of their "scheduled" visit assumes that attorney visits are scheduled at specific times against which to measure the 45-minute wait. Attorney visits are not scheduled at specific times. Rather, attorneys are required to give advance notice of visits by 24 to 48 hours depending on which facility a Class Member client resides in. Advance notice of attorney visits was a requirement that was first instituted due to the COVID-19 pandemic and was not required previously. This advance notice requirement was often informally referred to as a "schedule" requirement, which likely explains the miscommunication.

With this in mind, the Monitoring Team has attempted to identify an appropriate compliance measure for this provision and explored the possibility of defining a "scheduled visit" as the moment an attorney's entry is logged in PDP's visiting area. That is, PDP would need to provide attorneys with access to their clients within 45 minutes of their arrival at PDP facilities. Unfortunately, this method of measuring compliance would prove challenging. Attorney arrival and departure times are manually entered into a logbook that is maintained in the visitor processing area. This log does not contain Class Member client arrival times or note delays of any type. PDP maintains records of Class Members who are escorted to attorney visiting areas, but they do not contain information that can be matched to attorney arrival information. Furthermore, many attorneys see multiple clients each time they enter PDP, but their entrance

times are only logged once, making tracking of visits with multiple clients more challenging.  In any case, verifying precise wait times would require the Monitoring Team to compare manually logged attorney arrival times from the visiting logbook with Class Member movement records and then review CCTV to determine when Class Member clients arrived in the visiting area. This method is possible but not ideal and ongoing compliance with any policy changes would be prohibitively inefficient to measure.

As previously reported, the Monitoring Team has received external feedback that wait times for attorney visits have generally improved with recent positive changes.[41]  Periodic issues reported to the Monitoring Team include lengthy delays resulting from failed population counts, security incidents, or apparent confusion about changing COVID-19 protocols.  The Monitoring Team will complete additional analysis during site visits in the next reporting period, consult with the Parties, and identify an agreeable compliance measure for this provision.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP has made progress in providing more space and opportunities for virtual attorney visits and shortened wait times for Class Member clients.  PDP maintains records of scheduled and completed tablet visits, however, completed call reports do not reflect attorney visit schedules or note whether visits were delayed or cancelled.  The Monitoring Team reviewed a small snapshot of PDP's data on remote attorney visits from 2022 and verified that 8 of 10 visits reviewed occurred within minutes of the scheduled calls.  The remaining two visits reviewed connected 35 and 25 minutes after the scheduled times.

Since December 6, 2022, Deputy Monitor Grosso has scheduled weekly remote meetings with individual Class Members.  Of 55 total scheduled visits through February 6, 2023, 43 or 78 percent of the scheduled visits were completed.  Class Members were no-shows for the remaining 12 visits, and delays of 25 and 75 minutes occurred in 2 of 43 completed visits. Plaintiffs' co-counsel has reported similar issues with remote meetings with Class Members. According to data provided, 6 of 13 visits were delayed between 30 and 90 minutes, exceeding the 15-minute window provided for in this sub-provision.  Both the Deputy Monitor and Plaintiffs' co-counsel described direct contact with facility shift officers when remote meetings are delayed as improving attendance.  The Monitoring Team is considering necessary revisions to any post orders in its assessment of visiting protocols.  Details of above-described delays have been provided to PDP.  PDP is investigating the specific reasons for each, and any findings will inform program improvements.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

---

[41] Monitor's First Report, *supra* note 5, at 30.

**Compliance Rating:  Non-compliance**

PDP's current policy does not require notification to attorneys when visits are delayed or cancelled, and no temporary directives have been issued consistent with this requirement.  PDP did not notify the Deputy Monitor in advance of the 12 visits that were no-shows, however, he was notified of a unit disturbance that explained 1 of 2 delays.  Documentation provided by Plaintiffs' co-counsel reflects that they were not notified of any of the six delayed remote meetings or the of the three meeting cancellations.  Personnel should be apprised of the requirement to notify counsel of delays pending permanent policy revisions.

There is currently no way to measure if or when attorneys are notified of delays or reasons for delays or cancellations pursuant to this sub-provision.  Proper tracking of these requirements is laborious and requires real-time documentation of delays and cancellations, the reasons therefor, and details of any attorney notifications.  In developing recommendations, the Monitoring Team will prioritize improving remote meeting attendance followed by correcting tracking deficiencies to ensure PDP is able to monitor compliance with policy changes.

## Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating:  Partial Compliance**

In the first reporting period, PDP indicated that it was compliant with COVID-19 testing requirements recommended by the Philadelphia Department of Public Health (PDPH) and outlined in Commissioner Carney's February 7, 2022, memorandum.  Testing protocol required a single rapid COVID-19 test for Class Member patients who reside in "green" or non-quarantined housing units one day prior to scheduled court hearings.  Class Member patients who reside in "yellow" or quarantined housing units required two tests, one the day prior to and one the day of scheduled court hearings.  PDP provided data that from September 27, 2021 through July 29, 2022 they it had completed nearly 22,000 COVID-19 tests for those going to court.

In November 2022, the Monitoring Team audited a sample of PDP's more recent testing data, using one day from each month from July through November 2022. The audit confirmed that Class Member patients from COVID-19 isolation units were not being transported to court. Results also confirmed that PDP was consistently testing all Class Member patients once on either the day before or day of scheduled court hearings. However, results indicated PDP was not administering second COVID-19 tests to Class Member patients on quarantined housing units pursuant to approved protocol. Class Members on quarantined housing units were instead receiving one COVID-19 test the day prior to scheduled hearings only.

PDP was notified of audit results and non-compliance with testing protocols on November 10, 2022, and initiated a complete audit of testing records to determine when the deficient testing practices began. PDP reports that in the Spring of 2022, PDP experienced periods during which no housing units were on quarantine aside from regular intake units.[42] During these periods, Class Members required only one COVID-19 test. PDP determined that when COVID-19 surged in the Summer 2022, and quarantines were reinstituted, healthcare personnel inadvertently overlooked the requirement to return to the two-test protocol.

In this reporting period, PDP received guidance from PDPH to revise the COVID-19 testing and quarantine protocols, and on November 29, 2022, the Centers for Disease Control (CDC) amended its guidelines for correctional facilities.[43] Commissioner Carney issued a second memorandum on December 6, 2022, directing PDP healthcare to return to the single-test protocol for all Class Member patients in advance of scheduled court hearings. SME Dr. Belavich has reviewed and approved PDP's plan to ensure compliance with all future testing protocols and will complete a second audit in the next reporting period.

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

### Compliance Rating: Partial Compliance

As previously reported, PDP's quarantine protocol is developed and evolves based on guidance from the CDC and in consultation with PDPH, consistent with Agreement requirements. Since the April 12, 2022, Agreement date, PDP's quarantine protocol has been modified twice, first

---

[42] PDP reports that RCF, for example, had no units on COVID-19 quarantine from approximately February 29, 2022 through June 29, 2022, and PICC, from March 1, 2022, through July 20, 2022.

[43] *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities* (November 29, 2022) *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html

pursuant to CDC's *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* updated on May 3, 2022,[44] and described in the Monitor's First Report.  On November 29, 2022, the CDC issued *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities.*[45]  The November 2022 guidance supersedes the May 2022 guidance and includes the following:

1. Recommends enhanced COVID-19 prevention strategies when the COVID-19 Community Levels are high or when there are facility-specific risks.
2. No longer routinely recommends quarantine after someone is exposed to a person with COVID-19 but continues to provide considerations for facilities that prefer to continue implementing quarantine protocols.
3. Includes an option to end isolation for people with COVID-19 after seven days with a negative viral test.
4. Emphasizes the importance of maximizing access to in-person visitation to promote correctional and detention facility residents' mental health and well-being.

PDP reports that based on the November 2022 updated guidance and in consultation with PDPH, it has again modified its quarantine protocol as outlined in a memorandum issued by Commissioner Carney on December 15, 2022.  Specifically, PDP will:

1. Replace symptom screening at entry with placards and train staff, contractors, and visitors in steps to take if they are symptomatic.
2. Continue requiring masking by everyone when inside PDP facilities.
3. Continue use of Personal Protective Equipment as recommended by the CDC.
4. Discontinue requiring vaccination of Class Members before in-person visits.
5. Continue COVID-19 testing at intake.
6. Test those going to court once, the day before the scheduled court date.
7. Test for official visits once, the day before the scheduled visit.
8. Reduce the length of intake quarantine ensuring Class member patients have: (1) medical screening; (2) a negative COVID-19 PCR test; and (3) a negative TB test.  This revised process is estimated to reduce intake quarantine time from approximately 10 days to approximately 5 days.
9. Retain current COVID-19 isolation at 10 days.
10. Restrict movement if a housing unit has been exposed to COVID-19, testing Class Member patients on day 5 post-exposure.  If all Class Member patients test negative, movement restrictions will be lifted after day 5.  If on day 5, one or more Class member patients test positive, movement will remain restricted and Class Member patients will be tested after 5 additional days.

---

[44] Centers for Disease Control and Prevention, *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 3, 2022), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[45] *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities, supra* note 43.

PDP reports that it is currently following this protocol.  During site visits in this reporting period, the Monitoring Team was verbally notified which units were on COVID-19 quarantine and isolation.  Observing those units, the Monitoring Team noted that some personnel working in COVID-19 isolation units had not donned appropriate PPE.

The Monitoring Team makes the following recommendation for immediate action:

1. PDP should develop a system, including clear signage, that informs personnel, Class Members, and visitors of the status of every quarantine and isolation housing unit system wide.  Additionally, appropriate PPE should be readily available for everyone entering, working, or living in those units.

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

Despite improvements since the first reporting period, some PDP housing units remain in dangerous disrepair with living conditions that are unsafe, unsanitary, and fail to meet basic correctional standards.  PDP continues to provide documentation of regular cleaning inspections and the provision of cleaning supplies.  It also continues to provide documentation of monthly vector control treatments and PDP executives made efforts to improve them following the Monitoring Team's site visits in the first reporting period.  PDP's efforts thus far have been unsuccessful in some facilities.  Poor living conditions, especially in PDP's older facilities, raise doubt about the quality and frequency of inspections, and PDP's documentation that purports to certify them is unreliable.

Among successful improvements the Monitoring Team observed in this reporting period, conditions at PHSW were cleaner, quieter, and more appropriate for a hospital setting than during previous visits.  However, during site visits in both reporting periods, cells at PHSW were in disrepair and some were unusable due to maintenance delays.  As a small licensed hospital in a carceral setting, each lost infirmary bed greatly impacts patient care.[46]  In the first reporting period, the women residing in the intake unit at DC were subjected to the worst conditions observed system wide in that round of site visits.  PDP has since closed that unit for renovations and relocated women's intake to PICC.  The Monitoring Team observed deep cleaning of housing units at DC as renovations occur.  RCF units visited in this reporting period were also cleaner and the Monitoring Team received fewer complaints from Class Members about lack of access to cleaning supplies.  The Monitoring Team reviews CCTV of uses of force and other incidents and notes housing unit conditions depicted in recordings.  CCTV revealed generally

---

[46] DC and PHSW are not part of PDP's outside maintenance contract and must reply on City maintenance providers for repairs and routine maintenance.

clean dayrooms at CFCF and RCF.  Personnel responsible for these improvements should be acknowledged.

The physical plant issues at PICC and occupied units at DC remained unresolved in this reporting period.[47]  Emergency and routine maintenance are not occurring, and the older jail facilities are not being deep cleaned with sufficient frequency.  Broken windows and doors with shattered glass pose obvious risks to personnel and incarcerated populations and should be repaired immediately.  CCTV revealed uncollected trash and accumulated food waste on PICC housing unit floors.  Pest and rodent abatement requires continual removal of trash in all cells and living areas, which should be a daily priority in the housing units.  At DC, the Monitoring Team observed four male housing units that were crowded, dirty, and hanging items obscured direct line-of-sight supervision.  Dirty and nonoperational toilets, sinks, and showers, and other obvious maintenance issues on those units are also unacceptable.

As previously reported, some of the poor conditions described are beyond the control of PDP's executive team to correct.  Physical plant barriers and dangerous maintenance deficiencies are among them.  Documentation provided reveals that the 50 percent vacancy rate in maintenance personnel noted in the Monitor's First Report has grown to 58 percent in this reporting period, as depicted in the following table:

**Philadelphia Department of Prisons Maintenance Vacancy Report**
September 18, 2022 and November 27, 2022

|  | Position Classification | Budgeted | 18-Sep-22 | | 27-Nov-22 | | Difference | Vacancy Rate |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  |  |  | Filled | Vacant | Filled | Vacant |  |  |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 5 | 3 | 0 | 38% |
|  | Trades Worker II | 23 | 10 | 13 | 8 | 15 | 2 | 65% |
|  | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% |
|  | Building Engineer | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
|  | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
|  | **Total Maintenance** | **36** | **17** | **19** | **15** | **21** | **2** | **58%** |

Although plant operations issues require action by the City to expand PDP's existing maintenance contract, maintaining clean housing units is within PDP's direct control.  Based on electronic logs provided for review, facility supervisors are documenting inspection rounds, however, documentation rarely reflects the obvious maintenance and sanitation issues observed by the Monitoring Team during site visits, and issues are not being addressed.  During site visits, living unit staff acknowledge poorly maintained and unsanitary conditions, and PDP's personnel shortages are certainly impacting the frequency and quality of supervisors' inspection rounds.

---

[47] Monitor's First Report, *supra* note 5, at 34.

SME McDonald notes that staffing shortages this severe over long periods of time are so impactful to morale and operations, that higher tolerance for unsanitary conditions often result. The severity of persisting unsanitary conditions in several of PDP's housing units outweigh PDP executives' efforts thus far to mitigate them.  PDP must take immediate action to raise cleanliness standards to a level that affords Class Members a modicum of human dignity and should be highly prioritized with other critical reforms.

The Monitoring Team has noted that when Commissioner Carney is directly involved in identifying solutions to internal issues, corrective action is often swift and effective.  This has been true in her creation of the interdisciplinary Workgroup described under Substantive Provision 5—Healthcare above, and in other improvements to date.  The Monitoring Team does not doubt that the Commissioner's executive and management teams are also committed and hard-working, and the Commissioner's direct oversight of the Agreement's more complex reforms is necessary.  However, developing and maintaining a system to keep housing units clean and free from risk of vector-borne diseases is a routine jail management function that should not require the Commissioner herself to spearhead or supervise.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team has received regular complaints from Class Members in both reporting periods in most housing units about insufficient laundry services.  As previously reported, the Monitoring Team has inspected PDP's laundry facilities and confirmed adequate reserves of laundry supplies.  PDP has a laundry policy and most applicable post orders contain language about requirements for Class Members to have clean clothing and bed linens.  However, PDP's protocols for laundry services vary by facility and the policy and post orders do not account for operational differences between them.  For example, CFCF assigns a laundry officer to supervise a Class Member work crew and oversees weekly laundry exchange.  PICC, on the other hand, assigns Class Member workers to wash and distribute clean laundry.  Both practices are appropriate, but post orders should reflect operational nuances to ensure consistent laundry and linen exchange.

PDP has improved some protocols in this reporting period.  In the first reporting period, Class Members noted that linen exchange at CFCF was occurring at 4:00 am before most Class Members were awake.  PDP reports that it discontinued the practice in November 2022 and exchanges are now typically occurring after 9:00 am.  CFCF now also requires assigned laundry officers to document the location and time of issuance and captains to audit exchanges via CCTV.  Documentation and video were provided for review and confirm that self-auditing is occurring.

In some facilities, Class Member workers collect all dirty laundry in a housing unit, wash it, and return it to Class Members after cleaning later the same day.  This is an acceptable laundry

program, however, during site visits in this reporting period, the Monitoring Team observed that Class Members in several units had only been issued one set of outer wear. As a result, these Class members were required to wrap themselves in bed sheets or blankets while their clothing was being laundered. PDP executives report that the issue has been corrected.

During the October 2022 site visits, the Monitoring Team received complaints from Class Members that they had not been issued thermal underclothing or a second blanket despite Philadelphia temperatures registering a low of 46 degrees during the site visits. PDP's practice was to issue thermal underclothing and sweatshirts on a specific date each year, approximately 10 days after the dates of the October visit. PDP resolved the issue while the Monitoring Team was on site and agreed to update policy to provide weather-appropriate clothing based on forecasts rather than waiting until temperatures reach uncomfortable levels. The Monitoring Team has also recommended that PDP more closely monitor living unit temperatures and adjust thermostats and issue clothing and blankets accordingly.

Reported improvements will be verified in this reporting period, and if implemented, are effective solutions to identified problems. PDP executives are often highly responsive to issues raised by the Monitoring Team, which is positive. PDP should also endeavor to be more proactive in identifying deficiencies as reported by Class Members, personnel, and oversight and other advocates who enter PDP facilities or speak with Class Members frequently. Class Members who reported laundry issues to the Monitoring Team indicated that they had been complaining to facility personnel for some time to no avail. Similar complaints about laundry and sanitation have been echoed in the Monitoring Teams conversations with Plaintiffs' co-counsel and others. Often, outside entities are not authorized to share Class Member complainants' names with PDP, which can pose challenges in investigating individual complaints. However, even cursory inquiry into anonymous complaints can reveal practices that violate PDP policy or otherwise require correcting.

In the first reporting period, the Monitoring Team learned that PDP does not issue undergarments to the population. Class Members are required to purchase them or may request some through PDP chaplains. This is outside of established correctional practice, and the Monitoring Team recommended that the City issue undergarments, including socks, panties/boxers and brassieres at intake as a matter of course. PDP reports that it will implement this recommendation in the next reporting period.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree*

*required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated…. Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

**Compliance Rating:  Partial Compliance**

In this reporting period, the Monitoring Team continued its review of PDP's use of force practices pursuant to this substantive provision with a review of 24 completed use of force packages, including available CCTV and completed force investigations of incidents that occurred March through June 2022.  SME McDonald analyzed use of force tactics, including de-escalation efforts, use of force investigations, and management and executive level reviews of each incident.  This analysis established a baseline of PDP's practices that shape the Monitoring Team's recommendations and will be used to measure progress as changes are made.

This substantive provision requires PDP to provide refresher training on use of force policy III.A.8 – *Use of Force and Restraints*, which contains language emphasizing the importance of de-escalation.  PDP has satisfied this requirement with more than 90 percent of available staff documented as trained.  PDP's use of force policy is trained first at the academy and annually thereafter.  It governs under which circumstances force is authorized and provides for chain of command review at management, executive, and, in select cases, Commissioner levels.  The presence of use of force policies, training, and a review process provide PDP with a framework for effective practices.

PDP reports that it commenced more in-depth de-escalation and Crisis Intervention Team (CIT) training prior to the onset of the COVID-19 pandemic.  Training was then paused with the COVID-19 related operational changes and has not recommenced.  PDP reports that it has briefed all personnel on the expectation that de-escalation be utilized whenever possible prior to the deployment of force.  The Monitoring Team has observed personnel using verbal communication skills to effectively resolve issues that might otherwise have resulted in uses of force.

The 24 use of force incidents reviewed reveal troubling, deeply flawed use of force practices in which oleoresin capsicum (OC) spray and other types of force are too often used without attempts to de-escalate or resolve issues through verbal communication.  Inadequate force reporting and investigations, low standard and poor quality use of force reviews, and ineffective training foster a culture of complacency towards instances of unnecessary or excessive uses of force.  The Monitoring Team has not yet reviewed internal investigation and accountability practices, however, findings thus far suggest that they are also inadequate.  Implementing consistent de-escalation practices system wide will require profound operational and cultural shifts that the Monitoring Team doubts PDP will be able to achieve with existing personnel resources.

PDP's current force policy is the point of departure for problematic use of force practices present in the 24 cases reviewed.  The policy emphasizes de-escalation but ultimately authorizes the use

of force if a Class Member fails to comply with verbal commands absent active resistance or assaultive behavior. It is also unclear regarding: (1) when force is authorized for passive resistance; (2) protocols for pre-planned versus emergency force; (3) the role of behavioral health in de-escalation; (4) duty to intervene; and (5) duty to report excessive or unnecessary force. The policy also requires a clear statement of zero-tolerance for excessive or unnecessary force, failure to report apparent excessive or unnecessary force, and dishonesty in force reporting, among other revisions.

Despite policy limitations, PDP's internal use of force review process should have identified insufficient reporting and the need for additional investigation and training in 100 percent of 24 incidents reviewed. In only 2 of 24 incidents, lieutenant-level review identified areas for improvement. In one incident involving a group disturbance in a rotunda area, a lieutenant identified that a control booth officer should not have opened housing unit doors, which introduced additional Class Members to the disturbance. A more effective lieutenant-level review of this incident should have also documented:

- Failure to include reports by all responding and witness personnel.
- Inadequate post-incident investigation and interviews of involved Class Members.
- Poor documentation of medical clearances of involved Class Members.
- Poor group control tactics by responding personnel, resulting in one staff member being spat on.
- Failure to replace the victim staff member from supervision and escort duties post-incident with uninvolved personnel.

In at least 6 of 24 incidents, force might have been prevented had personnel used de-escalation or verbal communication. Each of the six incidents involved Class Members who had behavioral issues or acted out and most had failed to follow a direct command. However, none appeared to present an immediate threat of injury or serious threat to institutional security before OC spray was deployed. None of the command-level reviews identified attempts to de-escalate as necessary or appropriate. In one incident, a sergeant is seen on video instigating force by pushing a Class Member. The accompanying use of force review failed to note the sergeant's actions as inappropriate and failed to note a clearly false account of the incident documented in the use of force report. At the time of the review, none of the six incidents had been reviewed at the deputy commissioner or Commissioner levels.

In 2 of 24 incidents, highly problematic cases passed deputy warden and warden level reviews with no policy violations noted. Both cases were only referred for internal affairs investigations at the deputy commissioner level review several weeks later. On CCTV of one particularly violent incident, a staff member is seen using what clearly appears to be unnecessary and excessive force against a Class Member in retaliation for a staff assault. None of the witnessing or involved personnel intervened or reported the incident. The reviewing lieutenant identified one aspect of the incident as problematic and recommended training and a written reprimand. SME McDonald opines that in a properly functioning system, the conduct depicted on CCTV would have resulted in (1) immediate removal of one employee from all contact with Class Members; (2) immediate referral of the same employee for administrative and criminal

investigation and for possible referral to the District Attorney's office; (3) immediate referral for administrative investigation of all involved or witnessing personnel who failed to intervene or report the incident; (4) referral for administrative investigation of all supervisors and managers who failed to take appropriate action upon review of the investigation.  Final disposition of this case is still pending.

Additional issues with use of force reporting that were not identified in PDP's review of the 24 incidents provided include the following:

- None of the 24 reports provided complete accounts of incidents that precipitated the force.
- None of the 24 reports provided complete accounts of specific actions taken by personnel or Class Members before, during, and after each incident.
- Few reports quoted any statements by Class Members during incidents and only 2 of 24 documented statements following incidents.
- The majority of the reports reviewed failed to document essential post-incident protocols, such as whether involved Class Members were subsequently restrained, decontaminated if necessary, and whether they were returned to their housing units, reassigned, or placed in restricted housing.
- Incidents involving multiple Class Members were described in one or two paragraphs that lack detail about which Class Member took which action.
- Packages typically failed to contain reports by every involved or witnessing staff member.

In addition to failures to address poor report writing and potential unnecessary or excessive force, PDP's review practices fail to identify areas of need for additional staff training.  Many incidents reviewed involved insufficiently trained tactical response and poor isolation and containment.  In several incidents, personnel physically intervened in violent assaults when chemical agents would have been a more appropriate force option.  In some group disturbances, personnel failed to require uninvolved Class Members to return to their cells or assume a safe seated position until the situation was controlled.  In some cases, personnel are observed failing to handcuff involved participants or applying handcuffs improperly, at times resulting in staff assaults that might have been averted with better control.

It is clear that many PDP staff would benefit from additional or refined use of force training.  SME McDonald notes that post-incident reviews by managers can identify specific training needs of involved personnel and is a rich source of real-time training for officers.  She also notes that it is common to identify the need for additional training in most force scenarios because each incident has unique qualities, they often evolve quickly, and staff can and do make tactical errors.  Quality use of force review processes provide for the identification of errors and training needs, they ensure that reports are accurate, thorough, timely, and well-written, and they identify areas for improvement in department policies and protocols.

Correction of the issues identified here requires extraordinary time, effort, and resources.  Effective de-escalation practices require significant skills-development resources for personnel.

They require sufficient staffing to allow personnel off post to attend trainings.  They require immediate availability of supervisors to model appropriate tactics and behavior.  They require internal mechanisms to support and reward staff for appropriate handling of incidents.  They require time for close, consistent coordination with behavioral health staff.  De-escalation requires availability of personnel to step in and relieve colleagues who may be showing signs of frustration in an interaction.  It requires communication between Class Members and staff, which requires a sense of safety and a measure of mutual trust.  Unfortunately, de-escalation also requires time and patience that staff struggle to maintain in systems with such high vacancies and corresponding exhaustion and low morale.

Use of force incidents reviewed also highlight systemic deficiencies addressed in other Agreement provisions.  For example, many incidents involving Class Members who exit cells and refuse to return are associated with insufficient out-of-cell time or unresolved maintenance issues.  Group disturbances and other fights often involve the use of manufactured weapons that must be identified through enhanced search practices, which PDP has reported is challenging with such high daily post vacancies.  Ultimately, the City must address PDP's personnel shortages to support a quality de-escalation and use of force training program.

The Monitoring Team will continue its review in the next reporting period to include analysis of PDP's formal accountability mechanisms, internal affairs investigations, and disciplinary processes.  In the meantime, the Monitoring Team has recommended for immediate action the creation of a dedicated, full-time, single assignment team, led by a captain or lieutenant and staffed by lieutenants or sergeants, to serve as PDP's force review and training team.  The team's responsibilities may include:

- Immediate training of staff, supervisors, and managers in expectations regarding force reporting and force review, which include zero tolerance for the use of excessive or unnecessary force or failure of supervisors to address it.
- Initiate updates to PDP's use of force policy.
- Review available video immediately following use of force incidents to identify tactical, training, and policy issues and work with facility supervisors and managers to ensure thorough reviews.
- Mentor officers in appropriate tactics and de-escalation and reporting practices.
- Manage PDP's use of force review process to ensure incidents are reviewed at each appropriate level and within identified timeframes.

The Monitoring Team has also recommended that PDP:

1. Procure an updated use of force reporting and tracking system, and in the meantime, assign a tracking number to every use of force incident.
2. Transition from a fixed camera to a body worn camera system, and in the meantime, install additional fixed cameras when blind spots are identified in incident reviews.
3. Procure a personnel early warning system for use of force and begin to work with labor organizations on policies and procedures to improve policy compliance and reward staff for effective tactics, force prevention, and heroism.