**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| JOSEPH SIMMONS | : | |
| | : | Civil Action No. 01644-JMG |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| THE CITY OF PHILADELPHIA; AND | : | |
| COMMISSIONER BLANCHE CARNEY in her individual and official capacity; AND | : | |
| WARDEN MICHELE FARRELL, in her individual capacity; AND | : | |
| CORRECTIONAL OFFICER JESSIE WILSON, in his individual capacity, AND | : | |
| SERGEANT FITZGERALD DICK, in his individual capacity, AND | : | |
| SERGEANT ALFRED LEBESCO, in his individual capacity, AND | : | |
| LIEUTENANT DEEBU CHERIAN, in his individual capacity, AND | : | |
| LIEUTENANT LOVELL CRAWFORD, in his individual capacity | : | |

**PLAINTIFF'S FOURTH AMENDED COMPLAINT**

NOW COMES Joseph Simmons, complaining of Defendants Curran-Fromhold Correctional Facility, Philadelphia Department of Prisons, the City of Philadelphia, Warden

Michele Farrell, Prison Commissioner Blanche Carney, Correctional Officer Jessie Wilson, Sgts. Fitzgerald Dick and Alfred Lebesco, and Lts. Lovell Crawford and Deebu Cherian and for cause would show the Honorable Court as follows:

## INTRODUCTION

1.  In July of 2018, The City of Philadelphia detained Joseph Simmons after his arrest and arraignment for assault charges. More than two years later, still detained by the City of Philadelphia, deemed innocent and without any means to post bail, Simmons was assigned a new cell mate.  Simmons' new cellmate, who claimed to be suffering from paranoid schizophrenia, was often physically and verbally abusive of Simmons. On February 22, 2021, when the abuse became too much to bear, Simmons reported to a correctional officer, Defendant Jessie Wilson that his cellmate had threatened him with physical violence and that he, Simmons, was in imminent danger. Defendant Wilson acknowledged Mr. Simmons pleas, but shockingly, left the area moments later.  Defendant Wilson failed to secure assistance for Mr. Simmons and left the area unattended throughout the night. Moments after Defendant Wilson left, Mr. Simmons' cell mate began to brutally assault him, beating him and raping him twice throughout the night.

2.  That such a horrific occurrence could continue for hours without intervention in the Philadelphia Department of Prisons is the shocking but predictable result of the City's consistent practice of massively understaffing its jails. The block to which Mr. Simmons was assigned was intentionally left unattended by prison staff throughout the night.

---

Plaintiff's Complaint

3.  At the time Simmon's was assaulted, PDP knew that all PDP housing units require uninterrupted supervision by staff, that high population custody units require additional supervision to meet safety standards, that a minimum standard of care for PDP required backup personnel to provide prompt attention to urgent matters that threaten the safety of people in PDP's care, and that it was not meeting any of the above standards.

4.  Commissioner Blanche Carney knew that her failure to adequately staff the CFCF and other PDP correctional institutions posed an undeniable risk to those in custody.  Despite her understanding of that risk, she failed to take any steps to staff the PDP correctional institutions to an adequate level.

5.  This is an action brought by the Simmons against the Defendants for their failure to protect him from known and obvious risks which resulted in this assault.  These claims are brought under the Fourteenth Amendment of the United States Constitution.

## **PARTIES**

6.  Plaintiff, Joseph Simmons, is an adult individual and a resident of the state of Pennsylvania currently incarcerated in SCI Camp Hill, 2500 Lisburn Road, Camp Hill, PA 17011.

7.  Defendant, City of Philadelphia, a City of the First Class organized and existing under the laws of the Commonwealth of Pennsylvania was responsible for the creation and operation of the Philadelphia Department of Prisons including, but not limited to, the Curran-Fromhold Correctional Facility ("CFCF").  CFCF is located at 7901 State Road, Philadelphia, Pennsylvania.

Plaintiff's Complaint

8.  Defendant Warden Michelle Farrell was, at all times relevant hereto, the Warden for the Curran-Fromhold Correctional Facility, responsible for the assignments, staffing, and operations of CFCF. Defendant Farrell is being sued in her individual capacity.

9.  Defendant Prison Commissioner Blanche Carney was, at all times relevant hereto, the Commissioner for the Philadelphia Department of Prisons of the City of Philadelphia. Defendant Blanche Carney is being sued in her individual capacity.

10. Commissioner Carney was, at all relevant times, the final policymaker for the Philadelphia Department of Prisons and had knowledge of and control over the unconstitutional policy, practice and/or customs of understaffing and failing to train, supervise, and discipline officers who left housing units unsupervised.

11. Commissioner Carney had supervisory control over the Philadelphia Department of Prisons; employees at CFCF including its wardens; procedures on staffing and responding to emergencies, and the security of housing units. Commissioner Carney was also individually involved in the policies, practices, and customs that were enforced at CFCF and has given statements on staffing at the Philadelphia Department of Prisons.

12. Defendant Jessie Wilson is the corrections officer assigned to Mr. Simmons' unit who abandoned the unit on the night Mr. Simmons was assaulted without ensuring a replacement officer was present. Defendant Jessie Wilson is being sued in his individual capacity.

13. Defendant Sgt. Alfred Lebesco is the corrections sergeant on the 3-11 pm shift on February 22nd, 2021, who failed to address or investigate Simmons' reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention. Defendant Sgt. Lebesco is being sued in his individual capacity.

14.  In his role as correctional sergeant, Defendant Lebesco is responsible for discipline and custody of incarcerated persons at CFCF on his assigned shift and coordinating the activities of other correctional officers. In that role, he is also responsible or investigating and reporting all infractions of the rules and regulations of the facility, maintaining discipline among the incarcerated persons, and taking immediate action to quell disturbances.

15.  Defendant Lt. Deebu Cherian is the corrections lieutenant assigned to the A building of the Curran-Fromhold Correctional Facility on the 3-11 pm shift on February 22nd, 2021, who failed to address or investigate Simmons reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention.  Defendant Cherian is being sued in his individual capacity.

16.  In his role as correctional lieutenant, Lt. Cherian is responsible for investigating issues that affect incarcerated persons, including reviewing operational problems, and responding to emergency situations.

17.  Defendant Sgt. Fitzgerald Dick is the corrections sergeant who was assigned to the A building of the Curran-Fromhold Correctional Facility on the 11 pm-7am overnight shift beginning on February 22nd, 2021, who failed to address or investigate Simmons' reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention. Defendant Sgt. Dick is being sued in his individual capacity.

18.  In his role as correctional sergeant, Defendant Dick is responsible for discipline and custody of incarcerated persons at CFCF on his assigned shift and coordinating the activities of other correctional officers. In that role, he is also responsible or investigating and reporting all

infractions of the rules and regulations of the facility, maintaining discipline among the incarcerated persons, and taking immediate action to quell disturbances.

19. Defendant Lt. Lovell D. Crawford is the corrections lieutenant who was assigned to the A building of the Curran-Fromhold Correctional Facility on the 11 pm-7 am overnight shift beginning on February 22nd, 2021, who failed to address or investigate Simmons' reports that his life was in danger and failed to assign a correctional officer to supervise the block of Mr. Simmons' detention. Defendant Lt. Crawford is being sued in his individual capacity.

20. In his role as correctional lieutenant, Lt. Crawford is responsible for investigating issues that affect incarcerated persons, including reviewing operational problems, and responding to emergency situations.

21. At all times relevant to this Amended Complaint, Defendants City of Philadelphia, Commissioner Blanche Carney, and Warden Michele Farrell caused the injuries and harms to Mr. Simmons by failing to train, supervise, and discipline the staff at PDP and at CFCF, including, but not limited to, Defendants Wilson, Dick, Cherian, Crawford and Lebesco, and as a result, engaged in the prohibited conduct with the expectation that their conduct would not be subject to discipline or sanctions.

22. At all times relevant to this Amended Complaint, Defendants failed to properly protect Mr. Simmons and have shown a reckless disregard and deliberate indifference to the widespread violations of Mr. Simmons' constitutional rights despite knowing that leaving a unit housing area unstaffed for hours could endanger the safety of incarcerated persons.

---

Plaintiff's Complaint

23. At all times relevant to this Amended Complaint, Defendants recklessly failed to supervise and train, and/or hire competent personnel, including the Defendants named here, in the operation and supervision of housing units.

24. Defendants' reckless and deliberately indifferent actions are the direct and proximate cause of the assault of Mr. Simmons and his resulting injuries.

## JURISDICTION AND VENUE

25. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. § 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourteenth Amendment rights of the Plaintiff.

26. Venue is proper in this Honorable Court as Defendants' constitutional violations and otherwise violative conduct occurred within the Eastern District of Pennsylvania.

## FACTS

**The Detention of Joseph Simmons.**

27. In July of 2018, Joseph Simmons was detained to await trial for assault charges.

28. Bail was set, but Simmons was unable to post.

29. Because Simmons was unable to post bail, his detention awaiting trial extended into 2021.

30. Simmons was originally held in the Philadelphia Industrial Correctional Center, or PICC.

31. In October of 2019, the Philadelphia Department of Prisons or PDP, transferred Simmons to Curran-Fromhold Correctional Facility, or CFCF.

32. In October of 2020, the PDC disciplined Simmons for the alleged use of abusive language and placed him in disciplinary segregation, on the housing unit A1P4 at CFCF.

**The Initial Assaults of Joseph Simmons.**

33. While in segregation, Mr. Simmons was assigned a new cell mate ("Cell Mate")[1].

34. Cell Mate is approximately six-foot, one inch tall and weighs approximately two hundred and forty pounds.

35. Cell Mate outweighed Simmons by approximately sixty pounds.

36. Cell Mate had a reputation among prisoners and correctional officers for unpredictable swings in mood and violent tendencies.

37. Cell Mate told Mr. Simmons that he suffered from paranoid schizophrenia.

38. Simmons and Cell Mate shared one cell in disciplinary segregation until November or December of 2020, when they were transferred to a different cell for purposes of administrative segregation.

39. From October 2020 until November or December of 2020, Cell Mate physically assaulted Simmons on several occasions.

40. Simmons did not immediately report the assaults to a correctional officer because he feared doing so would result in further abuse and assaults from Cell Mate.

---

[1] The Cell Mate's full legal name is unknown to Mr. Simmons. Because (1) the legal name of Cell Mate has not been verified, and (2) the Philadelphia Department of Prisons has access to cell roster information that would allow Mr. Simmons to determine the real name of his assailant, Mr. Simmons utilizes Cell Mate to refer to his assailant in this filing.

Plaintiff's Complaint

**Joseph Simmons Reports that His Life is in Danger.**

41. Near the conclusion of his segregation in December of 2020, but before his assignment to a new cell, Simmons reported to a correctional officer that he did not want to remain in a cell with Cell Mate as he believed he would be assaulted again and feared for his safety.

42. Despite Simmons' report to the correctional officer that he feared for his safety if he remained in a cell with Cell Mate, he was again assigned to share a cell with him on A-1 pod 4.

43. The relationship between Simmons and Cell Mate continued to deteriorate.

44. Sometime on or around February 19, 2021, Cell Mate started accusing Simmons of reading his mail, touching his belongings, and plotting to harm him.

45. Simmons was not reading Cell Mate's mail, touching Cell Mate's belongings, or plotting to harm him; Simmons' interactions we intended only to placate Cell Mate and avoid any additional assaults.

46. For several days after or around February 19, 2021, Cell Mate threatened to physically assault Simmons with increasing intensity and regularity.

47. Simmons told Cell Mate that he didn't want to fight with him and that he was trying to get moved out of the cell.  Simmons sought only to avoid any physical altercations with him.

48. For several days after or around February 19, 2021, Simmons pled with correctional officers to move him from the cell because Simmons was afraid he was going to be assaulted by Cell Mate.

49. Finally on February 22, 2021, after Cell Mate's behavior became increasingly erratic and his threats of violence more severe, Simmons pressed the emergency call button in his cell to plead for help at approximately 10 pm. Mr. Simmons screamed from his cell and indicated to officer Defendant Wilson that he feared for his life and felt in danger of an imminent physical assault.

50. Upon information and belief, Defendant Wilson was the only staff member on duty in the segregation unit at the time, a unit that requires higher supervision and additional staffing to keep incarcerated persons safe.

51. After receiving Simmons report, Defendant Wilson did not intervene. Instead, he said that he would put his concerns in the logbook and tell his sergeant and lieutenant about Simmons' fears.

52. Defendant Wilson did not attempt to deescalate the situation and did not provide any immediate assistance beyond documenting Simmons' complaint. Inexplicably, Defendant Wilson then left the pod without being relieved for duty by another correctional officer and without hearing back from his sergeant or lieutenant.

**Joseph Simmons is Beaten and Raped.**

53. After Defendant Wilson left the block all individuals housed on A1P4 where then unsupervised.

54. After Defendant Wilson left the A1P4, Cell Mate put a towel over the cell window, a violation of CFCF rules.

55.    Had a correctional officer remained on the block, or if a correctional officer appeared to relieve Defendant Wilson, Cell Mate and Simmons would have been directed to remove the towel.

56.    The towel over the cell Simmons and Cell Mate's window remained until the next morning when a correctional officer reported to the block for the first time since the night since Defendant Wilson departed without being relieved.

57.    After placing the towel over the window, Cell Mate approached Simmons who was sitting on his bunk.

58.    Simmons pleaded with him and told him he did not want to fight.

59.    Cell Mate continued to approach Simmons.

60.    Simmons stood up and raised his hands defensively.

61.    Cell Mate began punching and hitting Simmons in the face and body.

62.    Cell Mate pushed Simmons up against the wall and continued to punch Simmons in the face and body.

63.    Simmons cried for help and one of the other prisoners called back that there was not a correctional officer on the block.

64.    Simmons continued to defend himself from Cell Mate's attacks, but after a prolonged struggle, Cell Mate leaned forward and bit Simmons in the face.  When Simmons reached up to his face, Cell Mate grabbed Simmons penis and testicles and began squeezing.

65.    Simmons begged Cell Mate to let go of his testicles and tried to hold as still as possible.

Plaintiff's Complaint

66. Eventually, he released Simmons.  Shocked and in severe pain Simmons staggered to the toilet to examine himself.  As he approached the toilet, Cell Mate came up behind him and again grabbed and squeezed his penis and testicles.

67. With Simmons' penis and testicles in his hand, Cell Mate slammed Simmons head down towards the toilet and ripped down his pants. He then penetrated Simmons anally with his penis.

68. Simmons begged him to stop but was powerless to end the attack because Cell Mate was squeezing his penis and testicles so hard that he was unable to resist.

69. When Cell Mate finished assaulting Simmons, Simmons dragged himself to his bunk and Cell Mate laid down in his bunk.

70. An indeterminate time later, Cell Mate got up out of bed, pulled Simmons half-way out of bed and anally penetrated Simmons with his penis again while restraining Simmons with his arms and bodyweight.

71. When Cell Mate finished raping Simmons again, Simmons again pulled himself into bed while Cell Mate laid down in his bunk.

72. Throughout the night of Simmons' assault Sergeant Dick, Sergeant Lebesco, Lieutenant Cherian, and Lieutenant Crawford all failed to investigate or address in any fashion Mr. Simmons' reports that he feared for his life and was in imminent danger of physical assault.

73. The next morning, when a correctional officer finally reported to the block, they were ordered to remove the towel from the window.

74.   Simmons was too fearful for his safety to immediately report the assault and rape. Nonetheless, as a result of the brutal beating and rape, he had a chipped tooth, a human bite mark on his face, a sprained wrist, and swollen penis and testicles.

75.   That day, and as soon he was no longer in the cell with Cell Mate and had an opportunity to report the attack, he told a correctional officer that he had been assaulted by Cell Mate and could not be put back in a cell with him.  That day, he also told a correctional officer that he needed immediate medical attention.

76.   After the assault and rape Simmons filed a grievance pursuant to the PDP policies and procedures.

77.   After receiving no responses to any of his grievances, Simmons appealed to Commissioner Carney asking if they had been received.

78.   Commissioner Carney replied to Simmons' letter that she had no record of his grievances but that the Prison administration would investigate his allegations.

79.   Simmons exhausted his administrative remedies.

## FAILURES OF THE PHILADELPHIA DEPARTMENT OF PRISONS

80.   For years, the Philadelphia Department of Prisons has displayed a consistent and systemic failure to maintain proper staffing practices, resulting in a significant understaffing leading to an increase in inmate deaths directly related to the lack of supervision.

81.   Prison Commissioner Blanche Carney and Defendant Michelle Farrell have long been aware of the dangers to those in custody created by their failure to maintain adequate staffing.

Plaintiff's Complaint

82. Not only did Commissioner Carney and Warden Michelle Farrell tolerate the escalating danger from their lack of staffing, Commissioner Carney went so far as to blame the issue on the general staffing shortages caused by the COVID-19, despite there being evidence that this practice existed long before the pandemic.

**PDP's Established Practice of Understaffing**

83. Understaffing has been a long-followed practice of the City of Philadelphia.

84. On November 4, 2004, then-Commissioner Leon King implemented a limited overtime policy for PDP officers, sparking significant under-staffing.

85. This understaffing led to an increase of violence in the jails and a deprivation of inmates' rights, as well as federal litigation to resolve the issue.

86. Additionally, in a federal whistleblower lawsuit, Philadelphia Department of Prisons Lt. Sholonda Gregory alleged the following:

> "In or about May 2016, long before COVID was an issue, Commissioner Carney drastically cut the budget for regular prisons operations and diverted funds to Corizon Health; GD Correctional Food Services; U.S. Facilities, Centurion Detention Health Services and other vendors at the expense of investments in the staff and infrastructure needed to assure good order and humane conditions. Commissioner Carney closed two jails – the Detention Center and the House of Corrections; more prisoners were packed into smaller space. The census was up

---

Plaintiff's Complaint

when she closed the jails. Officers were forced to change shifts and a mass resignation began at that time. The strain on the system became apparent."[2]

87.   In 2018, following the closure of the House of Corrections and the population reductions at the Alternative & Special Detention housing area, PDP revised its staffing post-plan. Previously, the Department authorized 2,032 security posts. Following the reorganization at PDP, the new plan authorized 1,820 posts. Even still, PDP's staffing post-plan still reflected an overall shortage of 129 security officers.[3]

88.   In 2019, authors of an independent report authorized by City Council wrote that PDP's "level of overtime use, in conjunction with its high ratio of inmates to correctional officers, indicates that the PDP is likely understaffed relative to other systems under review."[4]

89.   In her testimony before the Philadelphia City Council in May of 2019, Commissioner Blanche Carney also noted in her testimony that "we've been understaffed for a number of years…" and "that we had to reduce posts where we could, and we did reduce posts." [5]

---

[2] Sholonda Gregory v. City of Philadelphia, No. 2:22-cv-00929-BMS (E.D. Pa. Nov. 3, 2022) at *4.

[3] "Cost Efficiency Analysis: Philadelphia Department of Prisons Final Report," *CGL* (Feb. 28, 2019) at 14. https://phlcouncil.com/wp-content/uploads/2019/04/Philadelphia-Cost-Efficiency-Analysis-Final.03.25.19.pdf

[4] *Id*. at 10. The other systems under review included Dade County, FL, Cook County, IL, Sacramento County, Riverside County, CA, and Santa Clara County, CA, all similar in population size to the Philadelphia jail system.

[5] "FY 2020 Budget Hearing Philadelphia Prisons 5-1-2019" *Philadelphia City Council*, (May 1, 2019) https://www.youtube.com/watch?v=60SvdsQ923Y&ab_channel=PhiladelphiaCityCouncil

---

90. Commissioner Carney's written testimony indicated further plans to reduce staffing in FY 2020 by over 150 officers.[6]

91. In 2020, of 228 applicants, the Philadelphia Department of Prisons only hired 36 individuals, a recruitment yield of 15.8%.[7]

92. According to the Philadelphia Office of the Controller, from 2019 to April of 2021 the PDP saw staff vacancies triple and conditions within the facilities become increasingly unsafe.[8]

93. The Philadelphia Inquirer reported that during FY 2020, one in six staffers left their positions.[9]

94. Still, PDP did not implement new hiring practices to counteract the falling staffing levels prior to Mr. Simmons assault and therefore, were deliberately indifferent to the rights of incarcerated persons.

95. PDP and Defendant Carney and Defendant Farrell did not do any of the following to ensure adequate levels of staff before Mr. Simmon's assault:

   a. Bring in staff from nearby municipalities to fill crucial posts;

   b. Raise starting salaries for new correctional officers;

---

[6] "Philadelphia Department of Prisons Fiscal Year 2020 Budget Testimony May 1, 2019" http://phlcouncil.com/wp-content/uploads/2019/04/FY20-PDP-Testimony_submitted-to-Council-4.29.19.pdf

[7] "Second Monitor's Report," *Remick v. City of Philadelphia*, No. 2:22-cv-1959-BMS, (E.D. Pa. March 3, 2023) ECF No. 185.

[8] "Controller Rhynhart Calls for Staffing Increase at the Philadelphia Prisons Department to Improve Safety for Correctional Officers and Inmates" *City of Phila Office of the Controller*, (June 30, 2021) https://controller.phila.gov/controller-rhynhart-calls-for-staffing-increase-at-philadelphia-prisons-department-to-improve-safety-for-correctional-officers-and-inmates/

[9] https://www.inquirer.com/news/philadelphia-controller-rebecca-rhynhart-jail-prison-conditions-20210629.html

---

Plaintiff's Complaint

    c. Contract with staffing agencies to bring in part time officers to fill secondary security posts (front desk, administrative, maintenance), so that full time officers could be moved to staff housing areas;

    d. Conduct an independent staffing analysis to assess staffing needs and to increase staff levels in housing areas;

    e. Contract with a hiring and recruitment agency to recruit new staff.

96. Despite their knowledge of the staffing shortage, PDP and Defendant Carney did not take adequate steps to retrain staff to do any of the following:

    a. Training supervisors and other staff to have a contingency plan when staff fail to show up for their shifts;

    b. Training staff from other units (e.g., maintenance, administration) to provide staff in housing areas;

    c. Retraining staff to deal with emergencies in light of the severe staffing shortage;

    d. Retraining and/or replacing the emergency call button system in light of the staffing shortage;

    e. Ensuring an adequate first responder system to respond to emergencies.

97. Between August 2020 and May 2021 there were at least five homicides at PDP, a total higher than the previous eight years combined.[10]

98. City Controller Rebecca Rhynhart expressed grave concern with staffing, stating:

---

[10] "Expert Report by Bradford Hansen on Philadelphia Jails," *Thomas Remick et. al. v. City of Philadelphia and Blanche Carney*, (March 21, 2022) https://www.documentcloud.org/documents/21636473-expert-report-by-brandon-hansen-on-philadelphia-jails

---

Plaintiff's Complaint

"The Department of Prisons is at a tipping point. Inadequate staffing levels have led to unsafe conditions for workers and confinement of inmates, many of whom are pre-trial, to their cells – sometimes for 20 or more hours a day… The City is responsible for the Department of Prisons' more than 1,500 correctional officers and approximately 4,600 inmates. We have a duty to provide safe working conditions and humane living conditions. The City must take an all-hands-on-deck approach to reach this hiring goal, with rigorous recruitment and multiple classes."

99.     This assessment was based on data provided by PDP which showed that from 2019 – 2021, correctional staffing declined by 440 officers and only 119 new officers were hired within that same period. At the time of the statement, Rhynhart indicated that more than 300 COs were needed to meet adequate staffing.[11]

100.   Despite this stark warning, the City did not take an all-hands-on-deck approach.

101.   The City of Philadelphia acknowledged the danger that the staffing shortages create, pointing to the five inmate-on-inmate homicides in PDP facilities from August 2020 – May 2021, a total that exceeded the prior eight years combined.[12]

102.   The *Philadelphia Inquirer* frequently reported on the failures of the PDP, including an April 23, 2021, article that stated that there were shifts where as many as 14 of the 15 workers abandoned their shifts.[13]

103.   On May 19, 2021, it was reported that 64% of staff called out on Mother's Day weekend.[14]

104.   Commissioner Carney acknowledged that PDP was short 333 staff positions.

---

[11] Rhynhart Report.

[12] *Id*.

[13] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html

[14] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html

Plaintiff's Complaint

105. This number continued to grow, and in June 2021 it was then reported that PDP was short 382 officers needed to operate safely.[15] By August 26, 2021, the gap had grown to 483 officers.

106. In an August 26, 2021, report, the Pennsylvania Prison Society executive Director Claire Shubik-Richards stated "we have been warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point."

107. Correctional officers, including lieutenants, captains, and veterans of more than 20 years, told the *Inquirer* in October 2021 that the conditions in PDP facilities are the "worst they have ever seen."[16]

108. It was then reported that the number of staff needed to operate safely had grown to 500.

109. Highlighting the danger in the Philadelphia Prisons is the fact that the PDP inmate population fell by 2% since 2019, yet over that same period seen staffing levels dropped by 28%.

110. On November 4, 2021, an analysis of PDP staffing rosters found that 20-30% of shifts on a given day were filled by officers and supervisors working overtime, and more than 40% of shifts listed were not filled at all.[17]

111. David Robinson, the president of the correctional officers' union, Local 159 of AFSCME District Council 33, stated that "we're in a situation where we don't have staff. That makes

---

[15] https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html
[16] https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage20211006.html#loaded
[17] https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

---

Plaintiff's Complaint

the prisons dangerous…they had an obligation to keep these jails safe. And I'm going to be honest: I believe they failed."[18]

112. Adela Holt, a former correctional officer at the Philadelphia Department of Prisons stated, "There's no sugar-coating it. I'm scared someone is going to get murdered in there. Open up the line of communication with the inmates, open up the line of communication with the staff, and I'll guarantee you you'll see a great drop in assaults. The staff coming into work, they feel unappreciated."[19]

113. In September 2021, ABC News reported that "other states have reached out to their local National Guard to fill vacancies in prison security. Philadelphia has not considered this option."[20]

114. By the November report, the City Controllers officer claimed a 28% vacancy rate within PDP.

115. Commissioner Carney suggested then and has since continued to suggest that the COVID-19 pandemic is to blame, however at the same time the Pennsylvania Department of Corrections reported only a 5.6% vacancy rate.[21]

---

[18] Samantha Melamed and Dylan Purcell, "Stabbings at Philly jails went unnoticed amid staff shortages, video shows," *The Philadelphia Inquirer*, (Nov. 4, 2021) https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html
[19] Maggie Kent, "Philadelphia's prison guard shortages lead to dangerous conditions for inmates, staff," *6abc News*, https://6abc.com/prison-guard-shortage-philadelphia-system-inmates-safety/11027878/
[20] *Id.*
[21] *Id.*

---

Plaintiff's Complaint

Remick v. City of Philadelphia

116. In April of 2020, ten incarcerated individuals within various facilities operated by the Philadelphia Department of Prisons filed a civil rights class action lawsuit against the City of Philadelphia and Prison Commissioner Blanche Carney over the conditions of the prisons and treatment of inmates by staff.

117. Understaffing within the Department of Prisons was identified in that litigation as a central cause of most of the constitutional violations claimed.

118. Judge Schiller ordered the City and Carney (hereafter "Defendants") through a partial settlement agreement dated June 3, 2020, to rectify certain failures including providing regular staff to maintain safe and optimal operations for inmates.

119. A corrections expert employed by Plaintiffs in the case wrote the following in his report on the conditions at PDP: "The PDP is in a state of crisis as evidenced by the information above. This crisis is creating an unsafe and violent environment for inmates to live in. It must be stated emphatically that while there is a shortage of staff the Philadelphia Prison system still has the duty to protect inmates that are assigned to their facilities."[22]

120. In 2022, Judge Schiller ordered the appointment of an independent monitor to oversee the implementation of the settlement agreement to address Plaintiffs' complained of constitutional violations.

121. In a report docketed on November 4, 2022 (ECF 181), the Monitor stated that "PDP's increases in sworn staff resignations from FY 19/20 and 20/21 by 55% and 107%

_____

[22] Expert Report, Remick v. City of Philadelphia and Blanche Carney at 9.

respectively for an overall 221% increase over the two-year period reflect debilitating personnel losses." [23]

122.   In the Monitor's Second Report filed on March 3, 2023, the Monitor reported the following: "thus far, the City actions are not responsive to the enormity of PDP's staffing crisis and fail to acknowledge the duty imposed on Defendants by this Court to improve working conditions for more than 1,600 employees and reduce the suffering of more than 4,200 people confined in PDP facilities."[24]

**Reports**

123.   Throughout the entirety of the Remick litigation there were frequent status reports regarding Defendant's compliance.

124.   A report dated September 24, 2020, concluded "according to an initial review of the staffing reports produced by Defendants, CFCF appears to have the greatest issue with staffing shortages, with many months reporting a shortage of over 100 staff. Of the five facilities, the housing units at CFCF report the most pervasive incidents of noncompliance with the Order." (9/24/2020 Report at pp. 3, 7-10).

125.   The report noted that due to staffing shortages there would be times when "no CO enters a unit for upwards of two hours at a time, leading to delayed response to fights or medical emergencies." (*Id.* at p. 3; fn 2).

---

[23] "Monitor's First Report," *Remick  v. City of Phila and Blanche Carney*, at 8-9 (ECF 181).
[24] Monitor's Second Report, *Remick* at 13. ECF No. 185.

---

Plaintiff's Complaint

126. Within that same filing, Defendants acknowledged that "staff non-attendance has been an issue." (*Id.* at pp. 7, 11).

127. On October 7, 2020, both parties convened for a joint status report where it was noted that the City and Commissioner admitted their failure to comply with the Court Order, citing staff shortages. (10/7/2020 Report at p. 2).

128. Defendants acknowledged that at CFCF in particular, units would often face severe staff shortages for several days in a row which led to further the continued failure to comply with the order. (3/4/2021 Report at pp. 2, 7-8).

129. A March 19, 2021, joint status report again pointed out insufficient staffing as the primary reason reported by both inmates and PDP administrators for the City's failures to provide for inmate needs. (3/19/21 Report at p. 1).

130. Defendants cited "strenuous staff shortages" as the reason for their failure to allow inmates adequate out-of-cell time as required by the order. (*Id.* at pp. 2, 7-8).

131. This status report also made clear that despite the City of Philadelphia, PDP, and Commissioner Carney all blaming general staff shortages on the COVID-19 pandemic that "these issues are limited to the security staff," and that other areas, such as medical staff, are not calling out or failing to show to their shifts in the way that COs are. (*Id.* at pp. 3-4).

132. Within the April 8, 2021, report, it was made clear that the City, Commissioner Carney and the Wardens alike were aware that insufficient staffing would reasonably result in dangerous conditions, and that the failures had grown so severe that "there is no realistic prospect for the hiring of addition[al] correctional officers that will remedy these issues in the near-term.

The price for this failure is being borne by incarcerated persons." (4/8/2021 Report at pp. 3, 17-18).

133.   Staffing issues continued to become more severe, being labelled a "staffing crisis" by PDP in the August 19, 2021, status report.

134.   Soon after, a September 9, 2021, status report again outlined the staffing crisis.

135.   It was found then through data provided to the Court that the PDP staffing crisis was "caused not only by high rates of staff absenteeism, but also by the City's failure to have sufficient numbers of corrections officers to properly staff PDP facilities," with no "realistic plan for closing the gap in terms of correctional staffing." (9/9/2021 Report at p. 2).

136.   The PDP and the City continued to fall short of addressing their long-standing inadequate staffing, despite the repeated notices and prolonged dangers. (*Id.* at p. 2).

Plaintiff's Complaint

**Statements from Incarcerated Persons**

137. Between September 2020 and September 2021 incarcerated persons at PDP-run facilities provided declarations on their experiences within the prisons as part of the *Remick* litigation.

138. Across the board, they reported significant lack of staff resulting in the deprivation of their out-of-cell time, medication, mail, and proper supervision.

139. On September 20, 2020, Jacquar J. Stokes, a person housed at CFCF, said in his declaration that he had experienced the negative impacts of CFCF's understaffing.

140. Mr. Stokes stated that "insufficient staffing is a big impediment to our wellbeing. We are kept in our cells for days at a time and told this is because there are not enough COs on duty," noting that on the weekends "none" of the regular COs report to their shifts.

141. Another person at CFCF, Daniel Marshall, stated that on August 19, 21, 22, 24, and 26, 2020, they were not let out of their cells at all, with the only explanation on August 21st being that "not enough guards were present at the facility."

142. Kenneth Clark, an incarcerated person at CFCF, stated that on top of inadequate staffing generally, even the correctional officers that do come to their shifts sometimes would "leave for lunch and do not come back to let us out of our cells."

143. Also on December 3, CFCF incarcerated person Naeem Beyah stated that even though he is a block worker, he and other block workers are not permitted to leave their cells at times due to a lack of staff on the unit.

144. At the Philadelphia Industrial Correctional Center, another facility operated by PDP and Commissioner Blanche, Tony Bizzell stated that there were also inadequate staff there

---

resulting in dangerous and neglectful conditions, including on December 28, 2020, when Bizzell stated that another person committed suicide. Bizzell states that "I heard him asking for help several times before he died, but staff did not attend to him."

145. Karren Sprual, another person housed at CFCF, claimed in his declaration that "staff tells us that there are not enough correctional officers to have rovers on each unit." Rovers are staff members that move between units as additional assistance and support.

146. CFCF incarcerated person John Hart further corroborated the lack of COs, stating that "it has become commonplace to go large stretches of time without seeing COs on our unit."

**Inmate Emergencies and Violence Ignored**

<u>Dale Curbeam</u>

147. On January 15, 2021, 60-year-old Dale Curbeam was found face down in his cell at CFCF.

148. At the time of Dale Curbeam's murder, the rate of homicide in Philadelphia Correction facilities exceeded that of the rest of the country by a factor of 15 times.

149. Curbeam was pronounced dead just a few minutes after being discovered. The cause of death was ruled a homicide by blunt impact head trauma. Curbeam's cellmate was arrested in connection with the murder.

---

150. According to a report by the *Inquirer*, only one staffer was assigned when Curbeam was murdered.[25]

## Christopher Hinkle

151. Christopher Hinkle was arrested for a minor drug charge but was unable to pay his bond. He was sent to CFCF, where he was housed on the same cellblock as Mr. Faison.

152. On April 12th, Mr. Hinkle was beaten by his cellmate in a brutal, prolonged attack.

153. Hinkle sustained a broken neck among other blunt injuries.

154. Hours passed before Hinkle was discovered.

155. The delay in discovering Hinkle rendered him unsavable. Once found, he was put on life support before he died.

156. Hinkle's cellmate reportedly admitted to the assault. The cellmate had a long record of random assaults and violent criminal offenses, most of which appeared unprovoked.

157. Hinkle was a non-violent offender.

## Rashaan Chambers

158. In April of 2021, Rashaan Chambers was an inmate at CFCF.

159. On April 6, Chambers attempted to get medical care for his diabetes but was reportedly denied.

---

[25]     https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html

160.  According to his mother, Chambers reported that no guards checked on him during the night nor did they complete morning checks.

161.  Feeling ill, Chambers did not go out of his cell for recreation time on April 7, but this did not alert staff to check on him. Staff reportedly did not seek care or check on Chambers until his family complained.

162.  Chambers was eventually taken to the hospital.

163.  On April 16 at 8:42 a.m., Chambers was pronounced dead from complication of diabetic ketoacidosis.

164.  Despite there being a clear need for assistance, Chambers was ignored until his condition was too severe to survive.

<u>Eli Rosa</u>

165.  In a 2021 letter, Eli Rosa described the lack of correctional officers at CFCF where he was an inmate.

166.  Rosa wrote: "I've done had seizures, fights and fell off my bunk, and no C/O was around to help me get medical attention."[26]

---

[26]     https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

---

Plaintiff's Complaint

Quincy Day-Harris

167. On August 25, 2021, at the Detention Center, operated by PDP, 25-year-old inmate Quincy Day-Harris died by suicide.

168. According to his family, Day-Harris suffered from paranoid schizophrenia which was well documented through previous times when the jail had admitted him to the hospital for psychiatric purposes.

169. Day-Harris's family feels that the jail did not provide adequate oversight despite knowing that Day-Harris had documented mental health needs, resulting in his death.

Unknown Inmate #1

170. Norman Cooper, an inmate in CFCF's custody, reported that in 2020 an unknown inmate on his cell block committed suicide.[27]

171. It is alleged that due to insufficient staffing leading to guards not checking on cells, the unknown inmate was left hanging for several hours.

172. According to Cooper, the cellmate of the unknown inmate was banging on their cell for hours trying to summon help. The calls went unanswered.

---

[27] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html

Plaintiff's Complaint

Unknown Inmate #2

173. On September 30, 2021, an unknown inmate at CFCF was repeatedly beaten and stabbed by three other inmates.

174. There were no guards on the cell block.

175. The unknown inmate, with no help available, staggered back to his cell as other inmates mopped up the blood.

Armani Faison

176. On March 2021 Armani Faison was arrested for shop lifting and detained at CFCF to await trial.

177. On March 27, 2021, while in custody at CFCF, his cell mate, Kevin Massey repeatedly raped Armani Faison.

178. Despite repeated calls for help by Faison and other prisoners on the block, the rape only subsided upon the death of Faison.

179. The next morning, Faison's body was found naked, bloodies and floating in six inches of water.

180. For the entire duration of the assault and rape, there was no correctional supervision on the block.

## COUNT I: FOURTEENTH AMENDMENT

## AGAINST ALL INDIVIDUAL DEFENDANTS

181.   Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

182.   As set herein, this is a civil rights action brough pursuant to 42 U.S.C. § 1983 that challenged the unconstitutional actions of the Defendants that resulted in the rape and assault of Simmons.

183.   At all relevant times hereto, Defendants were "persons" acting under color of state law.

184.   The Fourteenth Amendment imposes on Defendants the obligation to take reasonable measures to protect pretrial detainees from violence at the hands of other inmates.

185.   As explained above, Defendants failed in their obligation at every turn.

186.   Defendants' conduct exposed Joseph Simmons to a substantial risk of harm.

187.   Defendants knew of and were deliberately indifferent to those known risks.

188.   As a result of Defendants deliberate indifference, Joseph Simmons was raped and assaulted.

189.   Defendants were in direct violation of the Fourteenth Amendment, as well as their own policies, when they recklessly, willfully and with deliberate indifference failed to remove Joseph Simmons from his cell after being alerted to the significant risk of injury posed by leaving him unsupervised in his cell.

190.   While acting under color of state law, Defendants affirmatively created the danger that led to Simmons injuries by:

a.   Defendants, including but not limited to Defendant Carney, Farrell, Wilson, Lebesco, Crawford, Dick, and Cherian, failed to maintain appropriate staff in the inmate housing units;

---

Plaintiff's Complaint

b.  Leaving Joseph Simmons in his cell after being specifically told of the danger of bodily harm he faced if he remained in his cell;

c.  Failing to call for backup officers in light of the clear emergency and danger Mr. Simmons faced;

d.  Failing to have a corrections officer on Mr. Simmons's cell block;

e.  Failing to remove the paper that Cell Mate placed over the window;

f.  Failing to conduct regular checks of the cells housing inmates for several hours;

g.  Failing to respond to repeated asks for help by Simmons and neighboring inmates;

h.  Failing to adequately protect Simmons from injuries while in their custody and control; and,

i.  Willfully subjecting Simmons to repeated rapes and assaults described herein.

191.  The danger created by the Defendants as set forth above was foreseeable and direct, and through their failures, willful disregard, and deliberate indifference to Mr. Simmons' safety, Defendants acted with a degree of culpability that shocks the conscience.

192.  Defendants acts and omissions caused Simmons to suffer extreme and severe physical and emotional injury, distress, terror, and agony.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendants Carney, Farrell, Wilson, Cherian, Lebesco, Dick, and Crawford pursuant to 42 U.S.C. § 1983, in an amount in excess of Five Million Dollars, including interest, delay damages, costs of suit, general and specific damages, punitive damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.

## COUNT II: FOURTEENTH AMENDMENT MUNICIPAL LIABILITY

## AGAINST DEFENDANT THE CITY OF PHILADELPHIA

193.  Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

194.  The customs, practices, and policies of the City of Philadelphia and Defendant Blanche Carney were the moving force behind the violation of Simmons' constitutional rights.

195.  Simmons was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, and by the City of Philadelphia through its many failures addressed *supra*.

196.  Policymakers and authoritative figures knew of the failures of the Philadelphia Department of Prisons as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the incarcerated persons in their custody and control.

197.  The City of Philadelphia was deliberately indifferent to a chronic and dangerous level of understaffing at jails operated by the Philadelphia Department of Prisons, including CFCF, and deliberately failed to take reasonable measures to remedy the problem despite repeated and worsening levels of violent assault prior to the incidents providing the basis of Mr. Simmons' claims.

198.  At the time of the assault of Mr. Joseph Simmons, and for a considerable time before and thereafter, the City of Philadelphia was deliberately indifferent to the need to train, supervise, and discipline correctional officers. Policymakers for the Philadelphia Department of Prisons had knowledge of the need for training, supervision and discipline and allowed that need to persist. They were aware of similar unlawful conduct in the past,

---

Plaintiff's Complaint

but failed to take precautions against future violations, and caused a pattern of understaffing and officers leaving their posts. Further internal affairs investigation practices failed to provide an internal disciplinary mechanism that imposed meaningful disciplinary and remedial action. The City of Philadelphia was deliberately indifferent to need to train, supervisor, or discipline in the following respects:

a.   A failure to train and supervise employees to remain at their security posts;

b.   A failure to train staff on responding to emergencies in light of the staffing shortage;

c.   A failure to train staff to develop an adequate first responder system in light of the staffing shortage;

d.   A failure to train and supervise employees to ensure officers respond to emergencies in a timely fashion;

e.   A failure to train supervisors and employees to come to the unit when there is an emergency;

f.   A failure to train and supervise employees to ensure that the insides of cells are visible at all times

g.   A failure to train and supervise employees to maintain awareness of the consequences of delays in responding to emergencies;

h.   Failure to train and supervise employees not to abandon their post and/or to not leave the premises unoccupied;

i.   A failure to train and supervise employees to appreciate the dangers in leaving their posts without sufficient backup

Plaintiff's Complaint

j.  A failure to train and supervise employees, including Defendants Cherian, Dick, Lebesco, and Crawford to ensure officers do not leave their posts without an officer relieving them;

k.  A failure to effectively discipline a substantial number of officers who were found to have engaged in misconduct;

l.  A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

m.  Failure to institute necessary training and supervision for officers who investigate absenteeism among staff to ensure proper investigation and follow through;

n.  Failing to institute training on responding to emergencies on housing units;

o.  Failing to ensure immediate assistance for medical emergencies;

p.  Failing to address chronic absenteeism among staff assigned to housing units

199.  The conduct of the individual defendants was proximately caused by the actions of the City of Philadelphia, who, with deliberate indifference, adopted customs, policies, and/or practices and/or failed to train, supervise, and discipline in such a way to allow the defendants to engage in pervasive unconstitutional conduct.

200.  The City, by and through its policymakers, knew that their employees would confront situations involving assaults by incarcerated persons that required emergency attention and that the wrong choice by an employee would cause the deprivation of the incarcerated person's rights.

201.  The unlawful conduct outlined above caused Mr. Simmons to be raped and assaulted for hours in his cell.

---

Plaintiff's Complaint

202. As a direct and proximate result of defendants' actions and omissions, Mr. Simmons sustained injuries and damages, including pain and suffering, mental anguish, emotional distress, physical injuries, which he continues to experience to this day and which will continue in the future.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant the City of Philadelphia and Defendant Blanche Carney, pursuant to 42 U.S.C. § 1983, in an amount in excess of Five Million Dollars, including interest, delay damages, costs of suit, general and specific damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.

Respectfully submitted,

**MCELDREW PURTELL**                              **ABOLITIONIST LAW CENTER**

/S/ Colin S. Haviland                              /S/ Nia O. Holston
Colin S. Haviland, Esq.                             Nia O. Holston, Esq.
John J. Coyle, Esq.                                 Bret D. Grote, Esq.
123 South Broad Street                              PO Box 8654
Suite 2250                                          Pittsburgh, PA 15221
Philadelphia, PA 19109                              t: (267) 357-0948
t: (215) 545-8800                                   nia@alcenter.org
chaviland@mceldrewpurtell.com                       bretgrote@abolitionistlawcenter.org
jcoyle@ mceldrewpurtell.com

---

Plaintiff's Complaint

<u>**CERTIFICATE OF SERVICE**</u>

I, Colin Haviland, hereby certify that a true and correct copy of Plaintiff's Third Amended

Complaint was served upon counsel for Defendants via ECF on May 22, 2023.

**McEldrew Purtell**

*/s/ Colin S. Haviland*
Colin S. Haviland, Esq.
John J. Coyle, Esq.
123 S. Broad Street
Suite 2250
Phila, PA 19109
T: 215-545-8800
chaviland@mceldrewpurtell.com
jcoyle@mceldrewpurtell.com

DATE:   May 22, 2023

---

Plaintiff's Complaint